**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND** | ) ) ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 1:07-cv-00684** |
| | ) **Assigned To:  Friedman, Paul L.** |
| **THE AULSON CO., INC.** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**JOINT AGREEMENT AND STIPULATION OF FACTS**

Pursuant to this Court's Order of July 22, 2008, Plaintiff International Painters and Allied Trades Industry Pension Fund (the "Fund") and Defendant The Aulson Co., Inc. (the "Company"), through their undersigned counsel, agree and stipulate to the following facts.[1]

**Rules Governing Contribution Obligations**

1.      At all times relevant to this action, the Fund was an "employee benefit pension plan" as defined in section 3(2)(A)(i) of the Employee Retirement Income Security Act, as amended ("ERISA"), 29 U.S.C. §1002(A)(i).

2.      At all times relevant to this action, the Company was party to or agreed to abide by the terms and conditions of a collective bargaining agreement ("Agreement") with one or more local labor unions or district councils affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC, which included terms and conditions governing its contributions to the Fund as specified in the Agreement.

---

[1]  The parties reserve the right to assert additional material facts in their respective motions for summary judgment.

3.      Exhibit 1 to this Joint Agreement and Stipulation of Facts ("Stipulation") is a true and correct copy of the Agreement.

4.      At all times relevant to this action, the Company agreed to abide by the terms and conditions of the Restated Agreement and Declaration of Trust ("Trust") as currently in effect.

5.      Exhibit 2 to this Stipulation is a true and correct copy of the Trust in effect during all times pertinent to the claims asserted in this case.

6.      At all times relevant to this action, the Company agreed to abide by the terms and conditions of the International Painters and Allied Trades Industry Pension Plan Rules and Regulations as amended and restated effective January 1, 2003, including amendments thereto (the "Rules"), as currently in effect.

7.      Exhibit 3 to this Stipulation is a true and correct copy of the relevant portions of the Rules in effect during all times pertinent to the claims asserted in this case.

8.      The provisions of the Agreement, Trust, and Rules set forth in Exhibits 1, 2, and 3 to this Stipulation, together with any applicable provisions of ERISA, fully describe the rules, regulations, and requirements applicable to the submission of contributions by the Company.

9.      Paragraphs 13 through 69 of this Stipulation fully set forth the calculations performed by the Company and submitted to the Fund concerning the amount of contributions owed under the terms of the Agreement, the Trust, the Rules, and ERISA, to the extent such calculations are pertinent to the claims asserted in this case.

10.     The Fund has not audited the information submitted by the Company in support of its calculations.

11.     For purposes of this Stipulation, and without waiving any future rights it may have under the Agreement, the Trust, the Rules, or ERISA to audit the information submitted by

the Company in support of its calculations, the Fund assumes the accuracy of the contribution amounts set forth in Paragraphs 13 through 69.

12.     As of the date of this Stipulation, without waiving any future rights it may have under the Agreement, the Trust, the Rules, or ERISA, the Fund is not aware of any further contribution amounts owed by the Company that are unpaid or that were not paid on a timely basis.

**DC 11 Contributions**

13.     The following table sets forth the Company's calculations of the pension contributions owed by the Company for employees represented by the International Union of Painters and Allied Trades, District Council No. 11 ("DC 11") and pertinent to the claims made in this case, based on the rates per hour established by the Agreement:

| Month | Hours Worked | Rate Per Hour | Contributions Due |
|---|---|---|---|
| November 2006 | 2920.75 | $5.75 | $16,794.31 |
| December 2006 | 1226.00 | $5.75 | $7,049.50 |
| January 2007 | 196.50 | $5.75 | $1,129.88 |
| February 2007 | 81.50 | $5.75 | $468.63 |
| March 2007 | 17.00 | $5.75 | $97.75 |
| April 2007 | 43.00 | $5.75 | $247.25 |
| May 2007 | 136.00 | Maryland - $5.75 | $782.00 |
|  | 231.00 | Massachusetts - $5.60 | $1293.60 |
| June 2007 | 293.00 | Maryland - $6.00 | $1758.00 |
|  | 112.00 | Massachusetts - $5.65 | $632.80 |
| July 2007 | 334.00 | Maryland - $5.90 | $1970.60 |
|  | 160.00 | Massachusetts - $5.75 | $920.00 |
| September 2007 | 304.50 | $5.75 | $1750.88 |
| October 2007 | 368.50 | $5.90 | $2174.15 |
| December 2007 | 171.50 | $5.75 | $986.13 |
| January 2008 | 47.00 | $5.75 | $270.25 |
| February 2008 | 8.00 | $5.75 | $46.00 |

14.     The following table describes the payments made in satisfaction of the DC 11 contribution obligations set forth in paragraph 13:

| Month | Payment | Check Date | Date Credited | Balance Due |
|---|---|---|---|---|
| November 2006 | $641.13 | 5/25/2007 | | $16,153.18 |
| | $1,781.06 | 9/7/2007 | 9/12/2007 | $14.372.12 |
| | $2,160.56 | 9/21/2007 | 9/28/2007 | $12,211.56 |
| | $2,028.31 | 10/5/2007 | 10/11/2007 | $10,183.25 |
| | $2,680.94 | 10/19/2007 | 10/26/2007 | $7,502.31 |
| | $2,124.63 | 10/29/2007 | 11/5/2007 | $5,377.68 |
| | $2,645.00 | 11/2/2007 | 11/7/2007 | $2,732.68 |
| | $2,732.68 | 11/15/2007 | 1/31/2008 | - 0 - |
| December 2006 | $865.38 | 5/25/2007 | | $7,049.50 |
| | $402.50 | 11/15/2007 | 1/31/2008 | $6,647.00 |
| | $1,857.25 | 11/26/2007 | 11/30/2007 | $4,789.75 |
| | $2,215.19 | 11/30/2007 | 12/11/2007 | $2,574.56 |
| | $2,574.56 | 12/14/2007 | 12/20/2007 | - 0 - |
| January 2007 | $534.75 | 5/25/2007 | 6/29/2007 | $595.13 |
| | $595.13 | 8/17/2007 | 6/29/2007 | - 0 - |
| February 2007 | $468.63 | 5/25/2007 | 6/29/2007 | - 0 - |
| March 2007 | $97.75 | 8/9/2007 | 8/15/2007 | - 0 - |
| April 2007 | $247.25 | 8/9/2007 | 8/15/2007 | - 0 - |
| May 2007 | $230.00 | | 7/12/2007 | $1,845.60 |
| | $1,845.60 | 8/17/2007 | 9/4/2007 | - 0 - |
| June 2007 | $1,758.00 | 7/13/2007 | 7/27/2007 | $632.80 |
| | $632.80 | 8/24/2007 | 9/6/2007 | - 0 - |
| July 2007 | $1,970.60 | 8/8/2007 | | $920.00 |
| | $920.00 | 8/24/2007 | 9/6/2007 | - 0 - |
| September 2007 | $1750.88 | 10/5/2007 | 10/26/2007 | - 0 - |
| October 2007 | $2174.15 | 12/7/2007 | 12/17/2007 | - 0 - |
| December 2007 | $986.13 | 1/17/2008 | 1/25/2008 | - 0 - |
| January 2008 | $270.25 | | 2/25/2008 | - 0 - |
| February 2008 | $46.00 | | 3/24/2008 | - 0 - |

15.    The Company, through the payments described in paragraph 14, has submitted the full amount of DC 11 contributions set forth in paragraph 13, but it has not tendered any additional amounts for interest or liquidated damages.

16.    The Fund seeks a total of $1,745.28 in interest on DC 11 contributions, as set forth in the following table:

| Month | Payment | Date Due | Date Credited | Rate | Interest Claim |
|---|---|---|---|---|---|
| November 2006 | $1,781.06 | 12/20/2006 | 9/12/2007 | 8% | $103.84 |

|  | $2,160.56 | 12/20/2006 | 9/28/2007 | 8% | $133.54 |
|--|-----------|------------|-----------|----|---------|
|  | $2,028.31 | 12/20/2006 | 10/11/2007 | 8% | $131.15 |
|  | $2,680.94 | 12/20/2006 | 10/26/2007 | 8% | $182.16 |
|  | $2,124.63 | 12/20/2006 | 11/5/2007 | 8% | $149.02 |
|  | $2,645.00 | 12/20/2006 | 11/7/2007 | 8% | $186.67 |
|  | $2,732.68 | 12/20/2006 | 1/31/2008 | 8% (2007) 7% (2008) | $241.40 |
| December 2006 | $402.50 | 1/20/2007 | 1/31/2008 | 8% (2007) 7% (2008) | $32.82 |
|  | $1,857.25 | 1/20/2007 | 11/30/2007 | 8% | $127.82 |
|  | $2,215.19 | 1/20/2007 | 12/11/2007 | 8% | $157.79 |
|  | $2,574.56 | 1/20/2007 | 12/20/2007 | 8% | $188.47 |
| January 2007 | $534.75 | 2/20/2007 | 6/29/2007 | 8% | $15.12 |
|  | $595.13 | 2/20/2007 | 6/29/2007 | 8% | $16.83 |
| February 2007 | $468.63 | 3/20/2007 | 6/29/2007 | 8% | $10.37 |
| March 2007 | $97.75 | 4/20/2007 | 8/15/2007 | 8% | $2.51 |
| April 2007 | $247.25 | 5/20/2007 | 8/15/2007 | 8% | $4.71 |
| May 2007 | $230.00 | 6/20/2007 | 7/12/2007 | 8% | $1.11 |
|  | $1,845.60 | 6/20/2007 | 9/4/2007 | 8% | $30.74 |
| June 2007 | $1,758.00 | 7/20/2007 | 7/27/2007 | 8% | $2.70 |
|  | $632.80 | 7/20/2007 | 9/6/2007 | 8% | $6.66 |
| July 2007 | $920.00 | 8/20/2007 | 9/6/2007 | 8% | $3.43 |
| September 2007 | $1750.88 | 10/20/2007 | 10/26/2007 | 8% | $2.30 |
| October 2007 | $2174.15 | 11/20/2007 | 12/17/2007 | 8% | $12.87 |
| December 2007 | $986.13 | 1/20/2008 | 1/25/2008 | 7% | $.95 |
| January 2008 | $270.25 | 2/20/2008 | 2/25/2008 | 7% | $.26 |
| February 2008 | $46.00 | 3/20/2008 | 3/24/2008 | 7% | $.04 |
| **TOTAL** | $35,760.00 |  |  |  | $1,745.28 |

17.    The Fund also seeks a total of $7,152.00 in liquidated damages on DC 11 contributions, which is 20 percent of the $35,760.00 total amount of DC 11 contributions listed in the second column of the table in paragraph 16.

18.    The Fund also intends to seek reasonable attorneys' fees and expenses in this matter.

19.    The Company disputes the Fund's claims for interest, liquidated damages, and attorneys' fees and expenses.

**Local 806 Contributions**

20.    During the period pertinent to this case, the Company has been obligated under the terms of a collective bargaining agreement with the International Union of Painters and Allied Trades, Local Union 806 ("Local 806"), to make pension contributions to the Fund.

21.    The following table sets forth the Company's calculations of the pension contributions owed by the Company for employees represented by the International Union of Painters and Allied Trades, Local Union 806 ("Local 806") and pertinent to the claims made in this case, based on the rates per hour established by the Agreement:

| Month | Hours Worked | Rate Per Hour | Contributions Due |
|---|---|---|---|
| September 2006 | 8780.00 | $5.00 | $43,900.00 |
|  | 5653.50 | $5.00 | $28,267.50 |
| October 2006 | 7577.00 | $5.00 | $37,885.00 |
|  | 10182.00 | $5.00 | $50,910.00 |
| November 2006 | 6106.35 | $5.00 | $30,531.75 |
|  | 10745.50 | $5.00 | $53,727.50 |
| December 2006 | 5476.50 | $5.00 | $27,382.50 |
|  | 3414.50 | $5.00 | $17,072.50 |
| January 2007 | 2768.00 | $5.00 | $13,840.00 |
|  | 544.00 | $5.00 | $2,720.00 |
| February 2007 | 2379.50 | $5.00 | $11,897.50 |
| March 2007 | 466.50 | $5.00 | $2,332.50 |
|  | 531.00 | $5.00 | $2,655.00 |
| April 2007 | 200.00 | $5.00 | $1,000.00 |
| May 2007 | 200.00 | $5.00 | $1,000.00 |
| June 2007 | 9401.00 | $5.00 | $47,005.00 |
| July 2007 | 10235.50 | $5.00 | $51,177.50 |
| August 2007 | 8774.50 | $5.00 | $43,872.50 |
| September 2007 | 5681.50 | $5.00 | $28,407.50 |
| December 2007 | 1722.50 | $5.00 | $8,612.50 |

22.    The following table describes the payments made in satisfaction of the Local 806 contribution obligations set forth in paragraph 21:

6

| Month | Payment | Check Date | Date Credited | Balance Due |
|---|---|---|---|---|
| September 2006 | $43,900.00 | 8/1/2007 | 9/13/2007 | - 0 - |
| | $28,267.50 | 8/1/2007 | 9/13/2007 | - 0 - |
| October 2006 | $37,885.00 | 8/1/2007 | 9/13/2007 | - 0 - |
| | $50,910.00 | 8/1/2007 | 9/13/2007 | - 0 - |
| November 2006 | $30,531.75 | 8/1/2007 | 9/13/2007 | - 0 - |
| | $53,727.50 | | 3/23/2007 | - 0 - |
| December 2006 | $27,382.50 | 8/1/2007 | 9/13/2007 | - 0 - |
| | $17,072.50 | | 3/23/2007 | - 0 - |
| January 2007 | $13,840.00 | 8/1/2007 | 9/13/2007 | - 0 - |
| | $2,720.00 | 8/1/2007 | 9/13/2007 | - 0 - |
| February 2007 | $11,897.50 | 8/1/2007 | 9/13/2007 | - 0 - |
| March 2007 | $2,332.50 | 8/1/2007 | 9/13/2007 | - 0 - |
| | $2,655.00 | 8/1/2007 | 9/13/2007 | - 0 - |
| April 2007 | $1,000.00 | | 8/1/2007 | - 0 - |
| May 2007 | $1,000.00 | | 8/1/2007 | - 0 - |
| June 2007 | $47,005.00 | | 8/1/2007 | - 0 - |
| July 2007 | $51,177.50 | | 9/10/2007 | - 0 - |
| August 2007 | $43,872.50 | | 10/22/2007 | - 0 - |
| September 2007 | $28,407.50 | | 10/30/2007 | - 0 - |
| December 2007 | $8,612.50 | | 2/6/2008 | - 0 - |

23.     The Company, through the payments described in paragraph 22, has submitted the full amount of Local 806 contributions set forth in paragraph 21, but it has not tendered any additional amounts for interest and its satisfaction of liquidated damages claims is in dispute.

24.     The Fund seeks a total of $17,646.29 in interest on Local 806 contributions, as set forth in the following table:

| Month | Payment | Date Due | Date Credited | Rate | Interest Claim |
|---|---|---|---|---|---|
| September 2006 | $43,900.00 | 10/20/2006 | 9/13/2007 | 8% | $3,155.99 |
| | $28,267.50 | 10/20/2006 | 9/13/2007 | 8% | $2,032.16 |
| October 2006 | $37,885.00 | 11/20/2006 | 9/13/2007 | 8% | $2,466.16 |
| | $50,910.00 | 11/20/2006 | 9/13/2007 | 8% | $3,314.03 |
| November 2006 | $30,531.75 | 12/20/2006 | 9/13/2007 | 8% | $1,786.73 |
| | $53,727.50 | 12/20/2006 | 3/23/2007 | 8% | $1,095.16 |
| December 2006 | $27,382.50 | 1/20/2007 | 9/13/2007 | 8% | $1,416.39 |
| | $17,072.50 | 1/20/2007 | 3/23/2007 | 8% | $232.00 |
| January 2007 | $13,840.00 | 2/20/2007 | 9/13/2007 | 8% | $621.85 |
| | $2,720.00 | 2/20/2007 | 9/13/2007 | 8% | $122.21 |

| | | | | | |
|---|---|---|---|---|---|
| February 2007 | $11,897.50 | 3/20/2007 | 9/13/2007 | 8% | $461.56 |
| March 2007 | $2,332.50 | 4/20/2007 | 9/13/2007 | 8% | $74.64 |
| | $2,655.00 | 4/20/2007 | 9/13/2007 | 8% | $84.96 |
| April 2007 | $1,000.00 | 5/20/2007 | 8/1/2007 | 8% | $16.00 |
| May 2007 | $1,000.00 | 6/20/2007 | 8/1/2007 | 8% | $9.21 |
| June 2007 | $47,005.00 | 7/20/2007 | 8/1/2007 | 8% | $123.63 |
| July 2007 | $51,177.50 | 8/20/2007 | 9/10/2007 | 8% | $235.56 |
| August 2007 | $43,872.50 | 9/20/2007 | 10/22/2007 | 8% | $307.71 |
| September 2007 | $28,407.50 | 10/20/2007 | 10/30/2007 | 8% | $62.26 |
| December 2007 | $8,612.50 | 1/20/2008 | 2/6/2008 | 7% | $28.08 |
| **TOTAL** | $504,196.75 | | | | $17,646.29 |

25.     The Fund also seeks a total of $100,839.35 in liquidated damages on Local 806 contributions, which is 20 percent of the $504,196.75 total amount of Local 806 contributions listed in the second column of the table in paragraph 24.

26.     The Fund also intends to seek reasonable attorneys' fees and expenses in this matter.

27.     The Company disputes the Fund's claims for interest, liquidated damages, and attorneys' fees and expenses.

**DC 51 Contributions**

28.     The following table sets forth the Company's calculations of the pension contributions owed by the Company for employees represented by the International Union of Painters and Allied Trades, District Council No. 51 ("DC 51") and pertinent to the claims made in this case, based on the rates per hour established by the Agreement:

| Month | Hours Worked | Rate Per Hour | Contributions Due |
|---|---|---|---|
| November 2006 | 1800.00 | $2.40 | $4,320.00 |
| | 568.50 | $.20 | $113.70 |
| | 261.00 | $.25 | $65.25 |
| December 2006 | 540.00 | $2.40 | $1,296.00 |
| | 524.50 | $.20 | $104.90 |
| | 83.00 | $.25 | $20.75 |
| January 2007 | 119.00 | $2.40 | $285.60 |

| February 2007 | 76.50 | $2.40 | $183.60 |
| June 2007 | 1293.28 | $2.40 | $3,103.87 |
| | 292.00 | $.20 | $58.40 |
| August 2007 | 115.50 | $2.40 | $277.20 |
| | 17.00 | $.20 | $3.40 |

29.    The following table describes the payments made in satisfaction of the DC 51 contribution obligations set forth in paragraph 28:

| Month | Payment | Check Date | Date Credited | Balance Due |
| --- | --- | --- | --- | --- |
| November 2006 | $4,498.95 | 6/1/2007 | 6/26/2007 | - 0 - |
| December 2006 | $1,421.65 | 6/1/2007 | 6/26/2007 | - 0 - |
| January 2007 | $285.60 | 6/1/2007 | 6/26/2007 | - 0 - |
| February 2007 | $183.60 | 6/1/2007 | 6/26/2007 | - 0 - |
| June 2007 | $3,162.27 | 7/18/2007 | 7/27/2007 | - 0 - |
| August 2007 | $280.60 | 10/16/2007 | 10/26/2007 | - 0 - |

30.    The Company, through the payments described in paragraph 29, has submitted the full amount of DC 51 contributions set forth in paragraph 28, but it has not tendered any additional amounts for interest or liquidated damages.

31.    The Fund seeks a total of $253.19 in interest on DC 51 contributions, as set forth in the following table:

| Month | Payment | Date Due | Date Credited | Rate | Interest Claim |
| --- | --- | --- | --- | --- | --- |
| November 2006 | $4,498.95 | 12/20/2006 | 6/26/2007 | 8% | $185.38 |
| December 2006 | $1,421.65 | 1/20/2007 | 6/26/2007 | 8% | $48.92 |
| January 2007 | $285.60 | 2/20/2007 | 6/26/2007 | 8% | $7.89 |
| February 2007 | $183.60 | 3/20/2007 | 6/26/2007 | 8% | $3.94 |
| June 2007 | $3,162.27 | 7/20/2007 | 7/27/2007 | 8% | $4.85 |
| August 2007 | $280.60 | 9/20/2007 | 10/26/2007 | 8% | $2.21 |
| **TOTAL** | $9,832.67 | | | | $253.19 |

32.    The Fund also seeks a total of $1,966.53 in liquidated damages on DC 51 contributions, which is 20 percent of the $9,832.67 total amount of DC 51 contributions listed in the second column of the table in paragraph 31.

33.    The Fund also intends to seek reasonable attorneys' fees and expenses in this matter.

34.    The Company disputes the Fund's claims for interest, liquidated damages, and attorneys' fees and expenses.

**Local 476 Contributions**

35.    The following table sets forth the Company's calculations of the pension contributions owed by the Company for employees represented by the International Union of Painters and Allied Trades, Local Union 476 ("Local 476") and pertinent to the claims made in this case, based on the rates per hour established by the Agreement:

| Month | Hours Worked | Rate Per Hour | Contributions Due |
|---|---|---|---|
| November 2006 | 1003.75 | $2.95 | $2,961.06 |
| December 2006 | 572.50 | $2.95 | $1,688.88 |
| February 2007 | 60.50 | $2.95 | $178.48 |
| March 2007 | 56.00 | $2.95 | $165.20 |

36.    The following table describes the payments made in satisfaction of the Local 476 contribution obligations set forth in paragraph 35:

| Month | Payment | Check Date | Date Credited | Balance Due |
|---|---|---|---|---|
| November 2006 | $2,961.06 | 9/24/2007 | 10/2/2007 | - 0 - |
| December 2006 | $1,688.88 | 9/28/2007 | 10/3/2007 | - 0 - |
| February 2007 | $178.48 | 9/28/2007 | 10/3/2007 | - 0 - |
| March 2007 | $165.20 | 9/28/2007 | 10/3/2007 | - 0 - |

37.    The Company, through the payments described in paragraph 36, has submitted the full amount of Local 476 contributions set forth in paragraph 35, but it has not tendered any additional amounts for interest or liquidated damages.

38.    The Fund seeks a total of $294.09 in interest on Local 476 contributions, as set forth in the following table:

| Month | Payment | Date Due | Date Credited | Rate | Interest Claim |
|-------|---------|----------|---------------|------|----------------|
| November 2006 | $2,961.06 | 12/20/2006 | 10/2/2007 | 8% | $185.61 |
| December 2006 | $1,688.88 | 1/20/2007 | 10/3/2007 | 8% | $94.76 |
| February 2007 | $178.48 | 3/20/2007 | 10/3/2007 | 8% | $7.71 |
| March 2007 | $165.20 | 4/20/2007 | 10/3/2007 | 8% | $6.01 |
| **TOTAL** | $4,993.62 | | | | $294.09 |

39.    The Fund also seeks a total of $998.72 in liquidated damages on Local 476 contributions, which is 20 percent of the $4,993.62 total amount of Local 476 contributions listed in the second column of the table in paragraph 38.

40.    The Fund also intends to seek reasonable attorneys' fees and expenses in this matter.

41.    The Company disputes the Fund's claims for interest, liquidated damages, and attorneys' fees and expenses.

**DC 4 Contributions**

42.    The following table sets forth the Company's calculations of the pension contributions owed by the Company for employees represented by the International Union of Painters and Allied Trades, District Council No. 4 ("DC 4") and pertinent to the claims made in this case, based on the rates per hour established by the Agreement:

| Month | Hours Worked | Rate Per Hour | Contributions Due |
|-------|--------------|---------------|-------------------|
| June 2006 | 112.50 | $.25 | $28.13 |

43.    The following table describes the payments made in satisfaction of the DC 4 contribution obligations set forth in paragraph 42:

| Month | Payment | Check Date | Date Credited | Balance Due |
|-------|---------|-----------|---------------|-------------|
| June 2006 | $28.13 | 3/3/2008 | 3/10/2008 | - 0 - |

44.    The Company, through the payments described in paragraph 43, has submitted the full amount of DC 4 contributions set forth in paragraph 42, but it has not tendered any additional amounts for interest or liquidated damages.

45.    The Fund seeks a total of $3.64 in interest on DC 4 contributions, as set forth in the following table:

| Month | Payment | Date Due | Date Credited | Rate | Interest Claim |
|-------|---------|----------|---------------|------|----------------|
| June 2006 | $28.13 | 7/20/2006 | 3/10/2008 | 8% (2007) 7% (2008) | $3.64 |
| **TOTAL** | $28.13 | | | | $3.64 |

46.    The Fund also seeks a total of $5.62 in liquidated damages on DC 4 contributions, which is 20 percent of the $28.13 total amount of DC 4 contributions listed in the second column of the table in paragraph 45.

47.    The Fund also intends to seek reasonable attorneys' fees and expenses in this matter.

48.    The Company disputes the Fund's claims for interest, liquidated damages, and attorneys' fees and expenses.

**Local 6 Contributions**

49.    The following table sets forth the Company's calculations of the pension contributions owed by the Company for employees represented by the International Union of Painters and Allied Trades, Local Union 6 ("Local 6") and pertinent to the claims made in this case, based on the rates per hour established by the Agreement:

| Month | Hours Worked | Rate Per Hour | Contributions Due |
|---|---|---|---|
| November 2006 | 342.50 | $2.80 | $959.00 |
| December 2006 | 132.50 | $2.80 | $371.00 |
| January 2007 | 44.00 | $2.80 | $123.20 |

50.    The following table describes the payments made in satisfaction of the Local 6 contribution obligations set forth in paragraph 49:

| Month | Payment | Check Date | Date Credited | Balance Due |
|---|---|---|---|---|
| November 2006 | $519.40 | 6/1/2007 | 7/12/2007 | $439.60 |
|  | $439.60 | 8/31/2007 | 10/11/2007 | - 0 - |
| December 2006 | $208.60 | 6/1/2007 | 7/12/2007 | $162.40 |
|  | $162.40 | 8/31/2007 | 10/11/2007 | - 0 - |
| January 2007 | $123.20 | 8/31/2007 | 10/11/2007 | - 0 - |

51.    The Company, through the payments described in paragraph 50, has submitted the full amount of Local 6 contributions set forth in paragraph 49, but it has not tendered any additional amounts for interest or liquidated damages.

52.    The Fund seeks a total of $75.24 in interest on Local 6 contributions, as set forth in the following table:

| Month | Payment | Date Due | Date Credited | Rate | Interest Claim |
|---|---|---|---|---|---|
| November 2006 | $519.40 | 12/20/2006 | 7/12/2007 | 8% | $23.22 |
|  | $439.60 | 12/20/2006 | 10/11/2007 | 8% | $28.42 |
| December 2006 | $208.60 | 1/20/2007 | 7/12/2007 | 8% | $7.91 |
|  | $162.40 | 1/20/2007 | 10/11/2007 | 8% | $9.40 |

| | | | | | |
|---|---|---|---|---|---|
| January 2007 | $123.20 | 2/20/2007 | 10/11/2007 | 8% | $6.29 |
| **TOTAL** | $1,453.20 | | | | $75.24 |

53.     The Fund also seeks a total of $290.64 in liquidated damages on Local 6 contributions, which is 20 percent of the $1,453.20 total amount of Local 6 contributions listed in the second column of the table in paragraph 52.

54.     The Fund also intends to seek reasonable attorneys' fees and expenses in this matter.

55.     The Company disputes the Fund's claims for interest, liquidated damages, and attorneys' fees and expenses.

**Local 603 Contributions**

56.     The following table sets forth the Company's calculations of the pension contributions owed by the Company for employees represented by the International Union of Painters and Allied Trades, Local Union 603 ("Local 603") and pertinent to the claims made in this case, based on the rates per hour established by the Agreement:

| Month | Hours Worked | Rate Per Hour | Contributions Due |
|---|---|---|---|
| November 2006 | 80.00 | $4.00 | $320.00 |

57.     The following table describes the payments made in satisfaction of the Local 603 contribution obligations set forth in paragraph 56:

| Month | Payment | Check Date | Date Credited | Balance Due |
|---|---|---|---|---|
| November 2006 | $320.00 | 1/19/2007 | 2/2/2007 | - 0 - |

58. The Company, through the payments described in paragraph 57, has submitted the full amount of Local 603 contributions set forth in paragraph 56, but it has not tendered any additional amounts for interest or liquidated damages.

59. The Fund seeks a total of $3.09 in interest on Local 603 contributions, as set forth in the following table:

| Month | Payment | Date Due | Date Credited | Rate | Interest Claim |
|---|---|---|---|---|---|
| November 2006 | $320.00 | 12/20/2006 | 2/2/2007 | 8% | $3.09 |
| **TOTAL** | $320.00 | | | | $3.09 |

60. The Fund also seeks a total of $64.00 in liquidated damages on Local 603 contributions, which is 20 percent of the $320.00 total amount of Local 603 contributions listed in the second column of the table in paragraph 59.

61. The Fund also intends to seek reasonable attorneys' fees and expenses in this matter.

62. The Company disputes the Fund's claims for interest, liquidated damages, and attorneys' fees and expenses.

**DC 711 Contributions**

63. The following table sets forth the Company's calculations of the pension contributions owed by the Company for employees represented by the International Union of Painters and Allied Trades, District Council No. 711 ("DC 711") and pertinent to the claims made in this case, based on the rates per hour established by the Agreement:

| Month | Hours Worked | Rate Per Hour | Contributions Due |
|---|---|---|---|
| November 2006 | 185.50 | | $1,512.97 |

64.    The following table describes the payments made in satisfaction of the DC 711 contribution obligations set forth in paragraph 63:

| Month | Payment | Check Date | Date Credited | Balance Due |
|-------|---------|-----------|---------------|-------------|
| November 2006 | $1,512.97 | | 10/24/2007 | - 0 - |

65.    The Company, through the payments described in paragraph 64, has submitted the full amount of DC 711 contributions set forth in paragraph 63, but it has not tendered any additional amounts for interest or liquidated damages.

66.    The Fund seeks a total of $102.14 in interest on DC 711 contributions, as set forth in the following table:

| Month | Payment | Date Due | Date Credited | Rate | Interest Claim |
|-------|---------|----------|---------------|------|----------------|
| November 2006 | $1,512.97 | 12/20/2006 | 10/24/2007 | 8% | $102.14 |
| TOTAL | $1,512.97 | | | | $102.14 |

67.    The Fund also seeks a total of $302.59 in liquidated damages on DC 711 contributions, which is 20 percent of the $1,512.97 total amount of DC 711 contributions listed in the second column of the table in paragraph 66.

68.    The Fund also intends to seek reasonable attorneys' fees and expenses in this matter.

69.    The Company disputes the Fund's claims for interest, liquidated damages, and attorneys' fees and expenses.

**Performance Bonds**

70.    Performance bonds, which guaranteed the payment of labor costs for work by Company employees, were available to cover portions of the contribution obligations listed in paragraphs 13 through 69 associated with the following three projects:

a.  Francis Scott Key Bridge, Baltimore Maryland ("Key Bridge");

b.  Triborough Bridge, New York, New York ("Triborough Bridge");

c.  Manhattan Bridge, New York, New York ("Manhattan Bridge"); and

d.  Carlton Bridge, Bath, Maine ("Carlton, Bridge").

71.    Exhibit 4 to this Stipulation is a true and correct copy of the bond for the Key Bridge project, which was issued by United States Fire Insurance Company ("USFIC").

72.    Exhibit 5 to this Stipulation is a true and correct copy of the bond for the Triborough Bridge project, which was issued by International Fidelity Insurance Company ("IFIC").

73.    Exhibit 6 to this Stipulation is a true and correct copy of the bond for the Manhattan Bridge project, which was issued by USFIC.

74.    Exhibit 7 to this Stipulation is a true and correct copy of the bond for the Carlton Bridge project, which was issued by Safeco Surety Company ("Safeco").

75.    On July 17, 2007, the Fund submitted a claim of $4,183.84 against the bond issued by USFIC for the Key Bridge project, including $2,711.69 in contribution obligations, $129.81 in interest, $542.34 in liquidated damages, and $800.00 in attorney's fees and costs.

76.    On July 17, 2007, the Fund submitted a claim of $106,195.27 against the bond issued by IFIC for the Triborough Bridge project, including $83,850.00 in contribution obligations, $4,775.27 in interest, $16,770.00 in liquidated damages, and $800.00 in attorney's fees and costs.

77.    On July 17, 2007, the Fund submitted a claim of $213,733.83 against the bond issued by USFIC for the Manhattan Bridge project, including $170,424.25 in contribution

obligations, $8,424.73 in interest, $34,084.85 in liquidated damages, and $800.00 in attorney's fees and costs.

78.     Local 806, which represents employees of the Company who worked on the Triborough Bridge and Manhattan Bridge projects, also submitted claims against the bonds issued by IFIC and USFIC for the Triborough Bridge and Manhattan Bridge projects.

79.     On July 17, 2007, the Fund submitted a claim of $36,074.12 against the bond issued by Safeco for the Carlton Bridge project, including $28,299.92 in contribution obligations, $1,314.21 in interest, $5,659.99 in liquidated damages, and $800.00 in attorney's fees and costs..

80.     On July 24, 2007, the Fund received a notice from Safeco denying its Carlton Bridge claim because it was not filed within 90 days after the last work performed by the Company on the project, which Safeco asserted to be December 21, 2006.

81.     Of the total Carlton Bridge claim described in paragraph 79, $24,853.17 was attributable to portions of the DC 11 contributions described in paragraph 13, the total amount of Local 476 contributions described in paragraph 35, and portions of the Local 6 contributions described in paragraph 49, as further detailed in the following table:

| Month | Union | Total Contribution Amount | Carlton Bridge Portion | Balance |
|---|---|---|---|---|
| November 2006 | DC 11 | $16,794.31 | $13,815.80 | $2,978.51 |
| December 2006 | DC 11 | $7,049.50 | $4,999.62 | $2,049.88 |
| January 2007 | DC 11 | $1,129.88 | $319.13 | $810.75 |
| November 2006 | Local 476 | $2,961.06 | $2,961.06 | - 0 - |
| December 2006 | Local 476 | $1,688.88 | $1,688.88 | - 0 - |
| February 2007 | Local 476 | $178.48 | $178.48 | - 0 - |
| March 2007 | Local 476 | $165.20 | $165.20 | - 0 - |
| November 2006 | Local 6 | $959.00 | $439.60 | $519.40 |
| December 2006 | Local 6 | $371.00 | $162.40 | $208.60 |
| January 2007 | Local 6 | $123.20 | $123.20 | - 0 - |
| **TOTAL** | | $31,420.31 | $24,853.17 | $6,567.14 |

82.    On August 7, 2007, IFIC issued a check to Local 806 in full and final satisfaction of its Triborough Bridge claims, in the total amount of $297,139.08, which included the Fund's contribution claims as well as other claims asserted independently by Local 806.

83.    USFIC issued a check to Local 806 in full and final satisfaction of its Manhattan Bridge claims, which included the Fund's contribution claims as well as other claims asserted independently by Local 806.

84.    After receiving the IFIC and USFIC payments, Local 806 forwarded the portions attributable to pension contribution obligations to the Fund.

85.    On September 13, 2007, in recognition of the satisfaction of contribution claims described in paragraphs 82 and 83, the Fund credited the Company with payment of all Local 806 contribution obligations for the months of September 2006 through March 2007, not including interest, liquidated damages, and attorney's fees and costs, as shown in the following table:

| Month | Total Contribution Amount | Triborough Bridge    Portion | Manhattan Bridge Portion | Balance |
|---|---|---|---|---|
| September 2006 | $72,167.50 | $28,267.50 | $43,900.00 | - 0 - |
| October 2006 | $88,795.00 | $50,910.00 | $37,885.00 | - 0 - |
| November 2006 | $84,259.25 | $53,727.50 | $30,531.75 | - 0 - |
| December 2006 | $44,455.00 | $17,072.50 | $27,382.50 | - 0 - |
| January 2007 | $16,560.00 | $2,720.00 | $13,840.00 | - 0 - |
| February 2007 | $11,897.50 | | $11,897.50 | - 0 - |
| March 2007 | $4,987.50 | $2,655.00 | $2,332.50 | - 0 - |
| **TOTAL** | $323,121.75 | $155,352.50 | $168,419.25 | - 0 - |

86.    On June 1, 2007, 2007, USFIC issued a check to the Fund, in the total amount of $2,711.69, in full and final satisfaction of its claims against the Key Bridge bond for contributions, but not including interest, liquidated damages, or attorney's fees and costs.

87.    Of the total Key Bridge claim described in paragraph 75, $728.00 was attributable to portions of the Local 6 claims described in paragraph 48, as further detailed in the following table:

| Month | Total Contribution Amount | Key Bridge Portion | Balance |
|---|---|---|---|
| November 2006 | $959.00 | $519.40 | $439.60 |
| December 2006 | $371.00 | $208.60 | $162.40 |
| **TOTAL** | $1,330.00 | $728.00 | $602.00 |

88.    Effective July 12, 2007, in recognition of the satisfaction of contribution claims described in paragraph 86, the Fund credited the Company with payment of the contribution obligations for Local 6 that are detailed in paragraph 87.

89.    All recoveries made by the Fund through the performance bonds described in paragraphs 70 through 88, to the extent pertinent to the claims in this case, are reflected in the contribution calculations set forth in paragraphs 13 through 69 of this Stipulation.

**Total Claims**

90.    Except for reimbursement of reasonable attorneys' fees and expenses, the total amount of claims in dispute in this case is $131,742.41, including $20,122.96 in interest and $111,619.45 in liquidated damages, as summarized in the following table:

| Union | Contributions Paid | Unpaid Contribution Claim | Interest Claim | Liquidated Damages Claim |
|---|---|---|---|---|
| DC 11 | $35,760.00 | - 0 - | $1,745.28 | $7,152.00 |
| Local 806 | $504,196.75 | - 0 - | $17,646.29 | $100,839.35 |
| DC 51 | $9,832.67 | - 0 - | $253.19 | $1,966.53 |
| Local 476 | $4,993.62 | - 0 - | $294.09 | $998.72 |
| DC 4 | $28.13 | - 0 - | $3.64 | $5.62 |
| Local 6 | $1,453.20 | - 0 - | $75.24 | $290.64 |
| Local 603 | $320.00 | - 0 - | $3.09 | $64.00 |
| DC 711 | $1,512.97 | - 0 - | $102.14 | $302.59 |
| **TOTAL** | $558,097.34 | - 0 - | $20,122.96 | $111,619.45 |

Dated: September 5, 2008

Respectfully submitted,                          Respectfully submitted,

_____/s/_____                            _____/s/_____
Kent G. Cprek, D.C. Bar No. 478231               Edward Lee Isler, D.C. Bar No. 417076
Philip A. Lozano, D.C. Bar No. 979737            Derry Dean Sparlin, Jr., D.C. Bar No. 411682
The Penn Mutual Towers, 16th Floor               1919 Gallows Road, Suite 320
510 Walnut Street                                Vienna, Virginia 22182
Philadelphia, PA 19106-3683                      Phone:  (703) 748-2690
Phone:  (215) 351-0611/0699                      Fax: (703) 748-2695
Fax:  (215) 922-3524                             eisler@islerdare.com
                                                 dsparlin@islerdare.com

Counsel for Plaintiff                            Counsel for Defendant
International Painters and Allied                 The Aulson Co., Inc.
Trades Industry Pension Fund

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of September, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Kent G. Cprek
> Philip A. Lozano
> The Penn Mutual Towers, 16th Floor
> 510 Walnut Street
> Philadelphia, PA 19106-3683

I will also send a copy of the foregoing document via first class mail, postage prepaid, to the aforementioned recipient.

Respectfully submitted,

_____/s/_____

Edward Lee Isler, D.C. Bar No. 417076
1919 Gallows Road, Suite 320
Vienna, Virginia 22182
Phone:  (703) 748-2690
Fax: (703) 748-2695

# NATIONAL BRIDGE & TUNNEL AGREEMENT

## BETWEEN

## INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

## AND

## THE AULSON COMPANY



RECEIVED

MAR 0 6 2006

GEN PRESIDENT

## ARTICLES OF AGREEMENT

This Agreement, executed **March 1, 2006** by and between the International Union of Painters and Allied Trades, AFL-CIO, CLC (hereinafter referred to as the "IUPAT") and **The Aulson Company** (hereinafter referred to as the "Employer") shall be in full force and effect for a period of one year from the above date and shall continue from year to year thereafter unless notice of termination or modification is given in writing by either party to the other at least sixty (60) days prior to any anniversary date.

## ARTICLE I - RECOGNITION

The Employer recognizes the International Union of Painters and Allied Trades, AFL-CIO, CLC (IUPAT) as the sole and exclusive bargaining representative for all employees in the employment of the Employer, on any and all work covered by this Agreement with respect to wages, hours, and other terms and conditions of employment.

## ARTICLE II - SCOPE OF AGREEMENT

***Section 1.***    The scope of work covered for this agreement shall be as set out in the attached *"Addendum"*.

***Section 2.***    The IUPAT recognizes that the Employer may be signatory to other Collective Bargaining Agreements and further, that work assignments vary in different areas of the country. Work may be assigned in accordance with historic practices in the area where the work is to be performed. Where more than one craft has historically performed work of a given category, the work may be assigned to that craft that has performed the predominant amount of work for the employer in that category and in that area.

***Section 3.***    This Agreement shall take precedence over all District Council, Local Union, Statewide or Region-Wide Agreements unless otherwise stated herein.

1

*Section 4.*    All other work performed by the Employer which is not spelled out in Section 1 and 2 of this Article and coming within the work jurisdiction of the IUPAT as presently set forth in its Constitution shall be performed and governed by the Local Collective Bargaining Agreement of any subordinate body of the IUPAT which is applicable in the area where the work or job is to be performed.

*Section 5.*    Since an essential part of this Agreement is to recover, for the IUPAT and its National Contractors, work that has gone non-union, and to maintain work that is Union, the parties agrees as follows: Where it is determined that at least ninety percent (90%) of all of the work described in **Article II, Section I** of this Agreement is currently being performed by members of an affiliated District Council or Local Union of the IUPAT within their granted territorial jurisdiction, then this Agreement shall not apply.    It is further agreed that the terms and conditions of the Collective Bargaining Agreement currently in effect within the territorial jurisdiction of an affiliated District Council or Local Union of the IUPAT shall prevail when it is determined by the International that this Agreement does not apply.

## ARTICLE III - NULL AND VOID

At the option of the IUPAT, this Agreement may be declared null and void at any time the Employer is not signatory to a currently effective collective bargaining agreement (covering the work covered by this agreement) with the IUPAT District Council or Local Union having geographical jurisdiction over the Employer's principal place of business.

## ARTICLE IV - FUNCTION OF MANAGEMENT

*Section 1.*    In the exercise of its functions of management, the Employer shall have the right to plan, direct and control operations of all its work, hire employees, direct the working forces in the field, assign employees to their jobs, discharge, suspend or discipline for proper cause (*proper cause for discharge includes but is not necessarily limited to incompetence, insubordination, habitual tardiness or absenteeism*) transfer, promote, demote, or lay off employees because of the lack of work, or for other legitimate reasons, require employees to observe the Employer's and/or contracting entities, rules and regulations not inconsistent with this Agreement, institute a fair and consistent drug policy, regulate the amount of equipment used and the use of equipment and other property of the Employer, decide the number of employees needed; provided, however, that the Employer will not use its rights for the purpose of discrimination against any employee.

*Section 2.*    On work as defined under **Article II,** the Employer and the IUPAT  recognize the necessity of promoting efficiency and agree that no Local rules, customs or practices shall be permitted that limit production or manpower required to do the work and that no limitations shall be placed on the amount of work which an employee is performing during the work day.  No regulations of tools shall be interpreted or enforced in any way to prevent their use where required or necessary to perform an acceptable job in accordance with specifications of the appropriate agency and where all proper safety regulations are enforced.

*Section 3.*    The IUPAT agrees that in those situations where presently the jurisdiction of work is divided between two or more District Councils or Local Unions, the IUPAT's General Executive Board will, upon request from either the District Council or Local Union or Employer, determine what District Council or Local Union will have jurisdiction of the work in question.

2

## ARTICLE V – HIRING PRACTICES & ASSIGNMENT OF EMPLOYEES

*Section 1.*     The assignment of employees and hiring practices covered for this agreement shall be as set out in the attached *"Addendum"*.

*Section 2.*     Regular employees of the Employer transferred from one locality to another by the Employer shall be privileged to exercise their normal functions and shall conform and comply with the provisions of this Agreement. These regular employees will not be required to deposit clearance cards in any Local Union unless they elect to do so of their own accord. The Employer will submit to the appropriate District Council or Local Union having jurisdiction of the area where the job is located a listing of all regular employees, on a weekly basis when requested. In addition to this list, a complete listing of all employees will be submitted to the appropriate District Council or Local Union having jurisdiction of the area where the job is located on a weekly basis.

*Section 3.*     Qualified employees shall mean that they are experienced in performing the type of work required and/or able to perform said type of work. All employees on all work performed under this Agreement must be qualified and certified as per the bid specifications for manpower qualifications required by the contracting agencies. The Union shall work with the Employer to see that all employees are certified as required. However, this shall be the sole responsibility of the Employer to see that all employees are certified as required.

## ARTICLE VI- WAGES, FRINGES, SUBSISTENCE &WORKING CONDITIONS

*Section 1.*     The wages, fringes, subsistence and working conditions covered for this agreement shall be as set out in *Schedule "A"* in the attached *"Addendum"*.

*Section 2.*     After the Employer has been awarded the job or the operation has commenced on a project, no subsequent change in wages or working conditions in such area will become effective insofar as the Employer is concerned, except for (1) deferred wage increases, and (2) negotiated wages or fringe benefit payment increases by the bargaining parties in the area. It is expressly agreed that when any work is performed in any area during a renegotiation period, the negotiated increase, if any, shall be paid retroactively back to the termination date of the previous area Agreement. There shall be no lockout by the Employer occurring during the period of negotiations.

*Section 3.*     The Employer when working in the jurisdiction of the District Council or Local Union affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC, where the projects are located, shall, with respect to employees hired from within said jurisdiction, make contributions on behalf of such employees to all pension, health, welfare, apprenticeship and training, and other fringe benefit funds provided for in the Collective Bargaining Agreement currently in effect between said District Council or Local Union and area contractors. On all employees the Employer brings into said area, the Employer shall make such contributions to their "home" fringe benefit funds as are provided for in the Collective Bargaining Agreement of the employees' "home" District Council or Local Union. For the foregoing purpose, the Employer hereby:

    (a)    Agrees that such contributions shall be made at the rate, in the manner and under the terms and conditions specified in the applicable Collective Bargaining Agreement;

    (b)    Agrees that where the International Union of Painters and Allied Trades Union

and Industry Pension Fund is applicable, contributions shall be made in the manner and under the terms and conditions specified in the Standard Form of Participation Agreement issued by the Trustees of said Fund;

(c)    Agrees to make a direct contribution of **five cents (.05)** to the Finishing Trades Institute (FTI) established under an agreement and Declaration of Trust effective May 1, 1995, for each hour or portion thereof worked by the Employer's employees.    Said contributions shall be made in the manner and under the terms and conditions specified in the Model Collective Bargaining Clause issued by the Trustees of said Fund.

(d)    Binds itself to all Trust Agreements or other Trust Documents establishing said fringe benefit funds;

(e)    Irrevocably designates as its Representative on the Board of Trustees of said Funds, such Trustees as are named in said Trust Agreements or other Trust Documents as Employer Trustees, together with their successors selected in the manner provided in said Trust Agreements or other Trust Documents; and

(f)    Agrees to be bound by all actions by said Trustees pursuant to the said Trust Agreements or other Trust Documents.

***Section 4.***    All of the employees covered by this Agreement shall be made aware of the project rules and regulations of the Company and the Employer at the time of their hire and that they shall be bound by them throughout the duration of their employment.  Violation of these project rules and regulations is direct and just cause for disciplinary action, including immediate discharge, subject to the grievance procedure.

***Section 5.***    **Central Collection System:** "The Employer, shall, with respect to any and all contributions or other amount that may be due and owing to the IUPAT and its related or affiliated Funds or organizations, including, but not limited to, the IUPAT Industry Pension Plan, the IUPAT Industry Annuity Plan, the IUPAT Finishing Trades Institute, the Painters and Allied Trades Labor Management Cooperation Initiative, the IUPAT Political Action Together (and any and all other affiliated International organizations as they may be created or established in the future), upon receipt of a written directive to do so by the affiliated Funds and organizations, make all required payments, either directly or through an intermediate body, to the "Central Collections' Unit" of the International Union and its affiliated Funds and organizations. Such contribution shall be submitted on appropriate forms, in such format and with such information as may be agreed to by Central Collections."

***Section 6.***    It is hereby expressly agreed that should the Employer fail to remit the scheduled payments contained in **Sections 1, 2, and 3** of this Article, it is fully understood that this Agreement is subject to termination as to such Employer by a seventy-two (72) hour notice in writing served upon the Employer by the IUPAT.  In addition to termination of the Agreement, the IUPAT and subordinate District Councils or Local Unions reserve and retain the right to enforce the Agreement by all lawful means.

4

## ARTICLE VII - HOURS OF WORK, SHIFT WORK AND HOLIDAYS

***Section 1.***     Unless otherwise specified in the attached addendum, the regular hours of work shall be as outlined in the local Collective Bargaining Agreement in the area where the work is being performed.

***Section 2.***     Unless otherwise specified in the attached addendum, the pay for holidays shall be time and one-half (1½).  Holidays shall be:  New Year's Day, Decoration Day (Memorial Day), Veteran's Day, Fourth of July, Thanksgiving Day and Christmas Day, on the days locally observed.  No work shall be performed on Labor Day except in case of emergency as to protect lives or property.

***Section 3.***     On Federal, State and Provincial election days, employees shall receive a full days wages for a half days work for the sole purpose of voting in said election.  Each employee shall be responsible for providing evidence of their having voted from their respective polling place to the Employer.

## ARTICLE VIII - PAY DAY

***Section 1.***     Wages will be paid weekly by check.  All employees who are discharged or laid off will be paid in full immediately.  Employees who quit may have to wait until the next regular pay day to receive any monies due them.

***Section 2.***     All employees will be given a statement of gross earnings and any deductions made.  Such statements shall show the Employer's name, the employee's name, the hourly rate of pay, the dates and hours worked, all deductions made and the net amount due the employee.  Wage payments shall conform to all applicable Federal and State Laws.

***Section 3.***     The IUPAT's representative shall have the right to inspect payroll records and time records pertaining to all employees covered under the terms of this Agreement.

## ARTICLE IX - JOB NOTICE

***Section 1.***     The Employer will notify the IUPAT at the IUPAT's Washington, DC office of every job on which the Employer has undertaken or contracted to perform work.  The job notice to the IUPAT shall show the customer, location, description of job, approximate starting date, name of and the number of local employees that will be required.  The job notice is to be sent to the IUPAT's office as soon as such fact is known to the employer.

***Section 2.***     The IUPAT will forward this information to the District Council or Local Union having jurisdiction of the area where the job is located.  Within five (5) days of receipt by the District Council or Local Union of the job notice sent from the IUPAT's Washington, DC office the District Council or Local Union representative must send notification to the Employer as to whether the required number of local employees are available.  In the absence of notification by the District Council or Local Union representative the Employer will be allowed to bring employees in from any other source or as otherwise specified in this Agreement.

***Section 3.***     Failure by the Employer to notify the IUPAT's office as prescribed above may require that the job be manned and performed under the terms of the area Agreement, at the discretion of the IUPAT.

## ARTICLE X - SUPERVISORS AND FOREMAN

*Section 1.*      The supervisor on each job will be a regular employee of the Employer and the supervisor's selection shall be the sole responsibility of the Employer. The supervisor shall give orders directly to the employees. The determination of the size of the force to be supervised lies exclusively with the Employer. No other supervisor will be required on jobs manned under this Agreement. The supervisor shall be qualified to handle and direct journeymen and/or apprentices in all operations of equipment and rigging assigned to the job by the Employer. The supervisor or other company's designee shall direct the company's safety program.

*Section 2.*      Large jobs may require the use of a foreman. The foreman shall be selected from the employees on the job. The number of foremen used will be the sole responsibility of the Employer. The foreman shall give orders directly to the employees. The Employer is entitled to require that any foreman be capable of personally performing any of the work done by the employees over whom the foreman has charge over in a manner satisfactory to the Employer's supervisor.

## ARTICLE XI - JOB STEWARD

*Section 1.*      The Business Representative of the District Council or Local Union having jurisdiction in the area where the project(s) are located shall have the right to appoint one (1) working steward per shift to act as a Representative of the District Council or Local Union in connection with the application of this Agreement with the signatory Employer.

*Section 2.*      The Job Steward's duties shall consist of seeing that all terms and conditions of this Agreement are being complied with and that all employees are members in good standing of the IUPAT wherever permissible under State and Federal Laws, in accordance with the provisions of Article XIII - Union Security, and the handling of grievances that may arise with the job foreman. The Job Stewards shall not, by reason of position, be exempt from work. The Job Steward shall perform work in the same manner as any other employee and shall cooperate with the supervisor to expedite the progress of the work. The Job Steward's decisions are subject to review and revisions by the District Council, Local Union or International Office of the IUPAT.

## ARTICLE XII - ACCESS TO JOBS

The Employer agrees that the International Representative and/or Local Representative of the District Council or Local Union shall have access to all jobs of the Employer subject to customer's rules and regulations.

## ARTICLE XIII - UNION SECURITY

*Section 1.*      All present employees who are members of the IUPAT on the effective date of this Agreement or on the date of execution of this Agreement, whichever is the later, shall remain members of the IUPAT in good standing as a condition of employment. All present employees who are not members of the IUPAT and all employees who are hired hereafter shall become and remain members in good standing of the IUPAT as a condition of employment on and after the 8th day following the beginning of their employment, or on and after the 8th day following the effective date of this Agreement, or the date of execution of this Agreement, whichever is the later.

*Section 2.*    In those instances where this Article may not be validly applied, the Employer agrees to recommend to all employees that they become members of the IUPAT and maintain such membership during the life of this Agreement, to refer the new employees to the appropriate area Union Representative and to recommend to delinquent members that they pay their dues since they are receiving the benefits of this Agreement.

## ARTICLE XIV - CHECK-OFF OF ADMINISTRATIVE DUES

*Section 1.*    When the Employer performs a job within the jurisdiction of a District Council or Local Union whose by-laws contain a provision for administrative dues or business agent "assessment" the Employer shall check-off from the wages of all employees covered by this Agreement and employed on that job administrative dues or business agent "assessment" in the amount stated in that District Council's or Local Union's by-laws, and shall remit that amount to that District Council or Local Union.

*Section 2.*    If the by-laws of the District Council or Local Union in whose jurisdiction the work is being performed contain no provision for administrative dues or business agent "assessment", the Employer shall check-off from the wages of all employees who are members of Local Unions outside said jurisdiction administrative dues or business agent "assessment" in the amount stated in the by-laws of each employee's "home" District Council or Local Union, and remit that amount to the proper District Council or Local Union.

*Section 3.*    The District Council or Local Union will notify the Employer in writing of the amount of administrative dues or business agent "assessment" specified in the by-laws.

*Section 4.*    On or before the 20th day of each month, the Employer will remit to the appropriate District Council or Local Union the entire amount due and owing as to each employee for the month previous.

*Section 5.*    The obligation of the Employer under this Article shall apply only as to employees who have voluntarily signed a valid dues deduction authorization form. On or before the 20th day of each month, the Employer will submit to the IUPAT and to the appropriate District Council or Local Union, a list of all employees covered by this Agreement who have not signed a dues deduction authorization form, together with the number of hours worked by each such employee during the month previous.

## ARTICLE XV - VOLUNTARY PAYROLL DEDUCTION OF POLITICAL CONTRIBUTIONS

*Section 1.*    Employers signatory to this Agreement hereby agree to honor authorizations for check-off of political contributions from employees who are union members in the following form, and to forward all contributions and reports on contributions on or before the 20th day of each month for the previous work month to *Combined National Fund, P. O. Box 79128, Baltimore, MD 21279-0128.*

### AUTHORIZATION FORM FOR CHECK-OFF OF POLITICAL CONTRIBUTIONS

I hereby authorize my employer to deduct from my pay the sum of five cents ($.05) for each hour worked (or from each regular paycheck _____dollars weekly), as a contribution to the Political Action Together - Political Committee (PAT-PC) of the International Union of Painters and Allied Trades. I further authorize and direct the

7

Employer to send to the *"Combined National Fund,"* on or before the 20th day of each month, the contributions and report on contributions due for the previous work month. Checks shall be made payable to *"Combined National Fund"* and mailed to *Combined National Fund, P. O. Box 79128, Baltimore, MD 21279-0128.*

I further authorize and direct the Employer to honor any instruction that it may receive from a duly authorized representative of PAT-PC concerning a change in mailing or payment instructions relating to these contributions, should such occur. This authorization is voluntarily made based on my specific understanding that the signing of this authorization card and the making of these voluntary contributions are not conditions of membership in the Union or of employment by my Employer; that I may refuse to contribute without reprisal; that the PAT-PC and the AFL-CIO COPE are engaged in joint fund raising and use the money they receive for political purposes, including but not limited to making contributions to and expenditures for candidates for federal, state and local offices and addressing political issues of public importance; and that the guideline amount indicated above is only a suggestion and I may contribute more or less and will not be favored or disadvantaged by the Union or my employer for doing so.

_____    _____
Signature
DC/LU #:_____
E-mail Address:_____

Contributions to PAT-PC are not deductible as charitable contributions for Federal income tax purposes.

**Section 2.**    In situations where the member is already covered by a voluntary IUPAT Political Action Program, at their "home" District Council or Local Union, Section 1 of this Article will be inapplicable.

## ARTICLE XVI - SAFETY

**Section 1.**    The Employer must abide by OSHA and all rules and regulations there under and all other applicable safety rules and regulations relative to the scope of work.

**Section 2.**    Safety rules and regulations, including those which may have been established by the Client and the Employer, shall be adhered to at all times as a condition of employment. Minimum standards provided by Federal, State and Local regulations shall be complied with. The IUPAT recognizes that the responsibility for establishment of safety rules and their enforcement rests with the Employer. The IUPAT and the Employer agree that the enforcement of safety rules is to the mutual benefit of both and any questions concerning such rules will be appropriate subjects for discussion with the area District Council or Local Union Representatives.

**Section 3.**    In accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the exclusive responsibility of the Employer to ensure the safety of its employees and compliance by them with all safety rules contained herein or established by the Employer. Nothing in this Agreement will make the IUPAT liable to any employees or to any other persons in the event that work related disease, sickness, death, injury or accident occurs. The word "IUPAT" as used in this Section, shall be the IUPAT or its affiliated District Council or Local Union. Questions arising under this Article will be appropriate subjects for discussion with the area District Council or Local Union Representative and for processing under the Grievance Procedure of Article XXII.

8

## ARTICLE XVII- MEDICAL TREATMENT

In case of minor injuries, employees will be paid for the time required to obtain first aid treatment at the employee's regular hourly rate. An employee who is injured to the extent of being unable to work the balance of the day will be paid for the full day at the employee's regular hourly rate.

## ARTICLE XVIII - WORK PRESERVATION

**_Section 1._**     To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows: If the Employer performs on-site construction work of the type covered by this Agreement, under its own name or the name of another, as a corporation, company, partnership or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners or stockholders, exercises directly or indirectly (through family members or otherwise), management, control or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

**_Section 2._**     All charges of violations of Section 1 of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement on the handling of grievances and the final and binding resolution of disputes. As a remedy for violations of this Article, the Joint Trade Board or Arbitrator shall be able, at the request of the Union, to require an Employer to pay (1) to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages those employees have lost because of the violations; and (2) into the affected Joint Trust Funds to which this Agreement requires contributions any delinquent contributions that resulted from the violations. The Joint Trade Board or Arbitrator shall be able also to provide any other appropriate remedies, whether provided by law or this Agreement. The Union shall enforce a decision of the Joint Trade Board or Arbitrator under this Article only through arbitral, judicial or governmental (for example, the National Labor Relations Board) channels.

**_Section 3._**     If, after an Employer has violated this Article, the Union and/or the Trustees of one or more Joint Trust Funds to which this Agreement requires contributions institute legal action to enforce an award by an Arbitrator or the Joint Trade Board remedying such violation, or defend an action that seeks to vacate such award, the Employer shall pay any accountants' and/or attorneys' fees incurred by the Union and/or the Joint Trust Funds, plus costs of the litigation, that have resulted from such legal action. This section does not affect other remedies, whether provided by law or this Article, that may be available to the Union and/or the Joint Trust Funds.

## ARTICLE XIX - SUCCESSOR CLAUSE

This Agreement, and any supplements or amendments thereto, hereinafter referred to collectively as "Agreement" shall be binding upon the parties hereto, their successors, administrators, executors, and assigns. In the event the Employer's business is, in whole or in part, sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceeding, such business and operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof. It is understood by this provision that the parties hereto shall not use any leasing or other transfer device to a third party to evade this Agreement. The Employer shall give notice of the existence of this Agreement and this provision to any purchaser, transferee, lessee, assignee, etc., of the business operation covered by this Agreement or any part thereof. Such notice shall be in writing with a copy to

the IUPAT at the time the seller, transferor or lessor executes a contract or transaction as herein described. The IUPAT shall also be advised of the exact nature of the transaction, not including financial details. In the event the Employer fails to require the purchaser, transferee or lessee to assume the obligations of this Agreement, the Employer, (including partners thereof), shall be liable to the IUPAT and to the employees covered, for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, but shall not be liable after the purchaser, transferee or lessee has agreed to assume the obligations of this Agreement.

## ARTICLE XX - NON-DISCRIMINATION

The Employer and/or the IUPAT shall not discriminate against any person because of or on account of race, creed, color, national origin, sex, age, disability, marital status, sexual orientation or citizenship status in all employment decisions, including but not limited to recruitment, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, lay-off and termination, and all other terms and conditions of employment.

## ARTICLE XXI - JURISDICTIONAL DISPUTES

It is understood that the Employer will not be asked to act upon any questions regarding jurisdictional disputes which may arise within the IUPAT itself or between the IUPAT and any other Unions affiliated with the AFL-CIO, CLC, and that if during the period of such disputes, questions or controversies continue, there shall be no cessation of work on account thereof. The IUPAT shall provide all possible assistance in the settlement of jurisdictional disputes. There shall be no stoppage of work or slowdown arising from any jurisdictional dispute.

## ARTICLE XXII - GRIEVANCE PROCEDURE

*Section 1.*    Grievance, as used in this Agreement, is limited to a complaint or request of an employee, Employer, the IUPAT and/or its appropriate District Council or Local Union which involves the interpretation or application of or compliance with the provisions of this Agreement.

*Section 2.*

*Step 1.* Should any dispute or grievance arise under any of the terms of this Agreement, the aggrieved employee(s), District Council or Local Union must file the grievance in writing with the General President's office (IUPAT) within ten (10) working days of the occurrence of said grievance or within ten (10) days after the facts underlying the grievance become known.

A.    Once the General President's office has received the grievance filed by employee(s), District Council or Local Union and the General President has determined that the grievance has merit, such grievance will be processed according to the procedures as spelled out in *Step 2* of this article.

B.    If the grievance is initiated by the General President's office (IUPAT), it shall be filed with the Employer and a copy of said grievance shall be sent to the appropriate Employee(s) Local Union or District Council.

10

C.   If the grievance is initiated by the Employer, the Employer shall file said grievance with the General President's office (IUPAT) within ten (10) working days of the occurrence of said grievance or within ten (10) days after the facts underlying the grievance become know. A copy of said grievance must also be filed with the appropriate District Council or Local Union.

**Step 2.** When a grievance has been timely filed, the Employer's jobsite Supervisor or Foreman and the area District Council or Local Union Representative shall meet jointly within ten (10) working days after the grievance has been filed in writing with the Employer to resolve the dispute.

**Step 3.** If the Representative of the aforesaid District Council or Local Union and the Employer do not succeed in the resolution of the matter, then the General President of the IUPAT shall be notified by either party at his Headquarters Office, in writing, not later than ten (10) working days following the meeting of the Local Representatives. The General President shall, in turn, notify the District Council or Local Union and the Employer, in writing, of a meeting to effectuate a settlement of the issue(s), which meeting shall be attended by the General President or his designated Representative and the Employer or the Employer's designated Representative and other interested parties called into the meeting by the General President or the Employer. Such a meeting shall be held within twenty (20) working days, or any other mutually agreeable date, and place, following the notification from the General President.

**Step 4.** If either the Employer or the IUPAT fails to agree to meet within twenty (20) working days from notification by the General President, or they do meet and fail to resolve said grievance, then either the Employer or the IUPAT may proceed to final and binding arbitration. As this is a National IUPAT Agreement, the IUPAT shall have the exclusive right to determine where the arbitration hearing shall take place and, therefore, the area from which the list of arbitrators shall be drawn. Either party may request a list of arbitrators from the Federal Mediation and Conciliation Service (FMCS) for the purpose of selecting an arbitrator by numerical ranking, pursuant to FMCS rules and regulations. In the event either party fails to respond with such numerical ranking to the FMCS within ten (10) working days after receipt of such listing, then that party shall be deemed to have waived the right to participate in the selection process and the arbitrator shall be selected solely by the other party. In either event, and regardless whether the arbitrator is selected by one or both parties, and regardless of whether one or both parties participate in the ensuing arbitration process, the arbitrator shall render a decision on the evidence and arguments presented which shall be final and binding on both parties to the Agreement and fully enforceable in a court of appropriate jurisdiction.

**Section 3.**    The arbitrator shall have no authority to alter in any way the terms and conditions of this Agreement, and shall confine the decision to a determination of the facts and an interpretation and application of this Agreement.

**Section 4.**    The cost of the arbitration shall be borne equally by the Employer and the IUPAT's affiliated District Council or Local Union having jurisdiction in the area where the dispute is originated.

**Section 5.**    There shall be no strike or lockout on any job over any grievance or dispute while it is being processed through this grievance procedure and until the said grievance procedure has been exhausted. However, and notwithstanding any contrary provision of the Agreement, the IUPAT may

remove employees from any job(s) of the Employer who fails or refuses to pay the wages and fringe benefits or to meet the schedule of hours provided for and required by this Agreement, or refuses to comply with a final and binding decision issued at any level of the grievance procedure.

**Section 6.**    Anyone filing a grievance shall exhaust all internal remedies under this Article before resorting to other judicial remedies.

# ARTICLE XXIII - SUBCONTRACTING

**Section 1.**    The Employer shall not contract out or subcontract any work covered by this Agreement to any subcontractor or other person unless that subcontractor or other person is a party to a Collective Bargaining Agreement with a District Council or Local Union affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC.

**Section 2.**    In the event the Employer subcontracts any job site work covered by this Agreement, the Employer shall be a guarantor of performance by the subcontractor of all terms and conditions of said subcontractor's Agreement with the IUPAT; or, in the absence of such an Agreement, of all terms and conditions of this Agreement.  In that event, the Employer shall be liable to the IUPAT for any act or omission of the subcontractor which in any way departs from or is inconsistent with the terms of said subcontractor's Agreement with the IUPAT; or, in the absence of such an Agreement, with the terms and conditions of this Agreement.

**Section 3.**    The Employer may subcontract work to other parties in order to control its risk with warranties, and to address particular manufacturer's requirements, provided that before doing so the Employer demonstrates to the satisfaction of the IUPAT that the subcontracting is essential for the foregoing purposes.

# ARTICLE XXIV – NO WORK STOPPAGE

**Section 1.**  (a) Except in the circumstances described in paragraph (b) of this section, no strikes, work stoppages, slow downs or picketing will be recognized, incited or supported by IUPAT, and any such action by employees will be unauthorized and will constitute grounds for discharge.  There shall be no lockouts by the Employer.

      (b)    The International may authorize strikes against work being performed under this agreement if the IUPAT District Council [or Local Union] with geographical jurisdiction over such work is engaged in a lawful strike against the Employer.  Jobs being performed outside the geographic jurisdiction of such District Council are not within this exception and may not be struck.

**Section 2.**    Due to the critical importance and necessity of insuring and continuing plant maintenance, the IUPAT and its affiliated District Council or Local Union and the employees covered under the terms and conditions of this Agreement shall perform their jobs regardless of actions or conditions which may be taken by others not a party to this Agreement.

**Section 3.**    The IUPAT or any of its affiliated District Council or Local Union shall not be subject to any liabilities or damage claims because of the actions of any individual members of the IUPAT.

## ARTICLE XXV - BOND

**_Section 1._**    It is further agreed that the Employer will post a bond in the amount of $50,000.00 guaranteeing payment of any wages or payment of any contributions to any approved fringe benefit plan, which may be obligatory as a result of this Agreement.

**_Section 2._**    This provision will be the exclusive bonding requirement as to work covered by this Agreement, superseding any additional or different requirements for bonding as set forth in the District Council or Local Union Collective Bargaining Agreement.

**_Section 3._**    Failure of the contractor to enforce this bonding provision will cause this Agreement to be null and void.

## ARTICLE XXVI - LABOR-MANAGEMENT COOPERATION INITIATIVE

**_Section 1._**    Commencing as of the effective date of this Agreement, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to The Painters and Allied Trades Labor-Management Cooperation Initiative (LMCI) for each employee covered by this Agreement, as follows:

    (a)    For each hour or portion thereof, for which an employee receives pay, the Employer shall make a contribution of five cents (.05) to the LMCI.

    (b)    For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

    (c)    Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees and probationary employees.

    (d)    The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the LMCI.

**_Section 2._**    The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

**_Section 3._**    All contributions shall be made at such times and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

**_Section 4._**    If an Employer fails to make contributions to the Labor Management Cooperation Initiative within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorney fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause, which may be provided or set forth elsewhere in this Agreement.

## ARTICLE XXVII - AGREEMENT QUALIFICATIONS

It is not the intent of either party hereto to violate any laws or any rulings or regulations of any Governmental authority or agency having jurisdiction of the subject matter of this Agreement, and the parties hereto agree that, in the event any provision of this Agreement is held to be unlawful or void by any tribunal having the right to so hold, this Agreement, on proper notice from either party, shall be reopened for the sole purpose of amending such provision or provisions, with the understanding that the remainder of the Agreement shall remain in full force and effect.

This Agreement shall be in full force and effect from _**March 1, 2006,**_ up to and including _**February 28, 2007**_ and shall continue from year to year thereafter unless written notice of desire to modify the or terminate the Agreement is served by either party to the other not less than sixty (60) days prior to any anniversary date.

      **IN WITNESS WHEREOF,** the parties hereto execute this Agreement as of the day and year noted above.

**SIGNED FOR THE GENERAL EXECUTIVE
BOARD OF THE INTERNATIONAL UNION
OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC**

**BY:**

_James A. Williams_
_____
**James A. Williams
General President**

_3/6/06_
_____
**Date**


**SIGNED FOR THE EMPLOYER
The Aulson Company**

**BY:**

_____
**Thomas Higgins
President**

_2-28-06_
_____
**Date**

14



**ADDENDUM**
**TO THE**

**NATIONAL BRIDGE AND TUNNEL AGREEMENT**

## ARTICLE II - SCOPE OF AGREEMENT

*Section 1.* This Agreement shall apply to all work, tools, equipment, and materials needed in conjunction with painting, cleaning, or inspecting a bridge or tunnel of any kind located within the United States. This Agreement shall apply to all new, repaint, washing and cleaning work coming under the jurisdiction of the IUPAT on bridges of all types including rail bridges and tunnels, viaducts and appurtenances, including but not limited to: priming, painting and coatings, work such as power cleaning, all types of abrasive blasting, metalizing and related processes, waterblasting, vacuum blasting, wire brushing, coating strippers, buffing, steam, solvent or detergent cleaning, the rigging, the installation and maintenance of containment enclosures, the operation of all necessary equipment, and the handling of and clean up of all materials and debris in conjunction with the work on bridges, tunnels, viaducts and appurtenances.

Work covered by this Agreement shall include the rigging of bridges or tunnels for the purpose of inspecting them or giving access to engineers and others to inspect such. The moving and handling of all trucks, scaffolding, all traffic control, and manning the boats will also be work covered by painters so long as the rental or leasing of such equipment is not covered under another Agreement to which the employer must comply.

This Agreement shall include paint removal on structures covered by this Agreement even when such removal is not preparatory to painting.

## ARTICLE V - HIRING PRACTICES & ASSIGNMENT OF EMPLOYEES

*Section 1.* It is agreed between the IUPAT and the Employer that on jobs outside the Employer's home area, the Employer may bring in the first four (4) employees from among his/her regular employees, provided that said employees are IUPAT members in good standing. The fifth (5th) employee shall come from the District Council or Local Union having geographical jurisdiction in the area where the work is being performed provided employees are qualified and available. After the fifth (5th) employee the employer may bring one (1) employee from among his/her regular employees and the District Council or Local Union where the work is being performed may send one (1) employee and this one (1) to one (1) ratio will continue until the job is fully staffed. If local qualified employees are unavailable, the employer may use a higher ratio of regular qualified employees. Once qualified employees are employed on the job as provided herein, they shall not be replaced for the purpose of establishing the applicable ratios set forth above. On jobs where the crew is four (4) persons or less, the District

Council or Local Union where the work is being performed shall have the right to place one (1) qualified Journeyman on the job at the inception of the job. If no qualified Journeyman is available, the District Council or Local Union shall have the right to place an employee on the job in any of the other job classifications recognized by this Agreement. The non-working foreman or supervisor shall not count toward the Employer's initial four (4) employees.

    **(a)** Local employees shall be referred in accordance with the referral procedure of the applicable Local providing, however, that the referral system is legal and permissible under Federal and State law. If the Employer desires certain experienced employees, the Employer may call for such employees, who, if available, shall be referred by the Local Representative to the Employer.

# ARTICLE VII - HOURS OF WORK, SHIFT WORK AND HOLIDAYS

***Section 1.*** The IUPAT recognizes that climate and other conditions beyond the control of the Employer often control the hours of work on a job. Because of this, eight (8) hours shall constitute a work day, when working a five (5) day work week, all work over eight (8) hours shall be paid at the rate of time and one-half.

    **(a)** Forty (40) hours, Monday through Sunday inclusive shall constitute a week's work. All work over forty (40) hours shall be paid at the rate of time and one-half. The Employer may establish a work week of four (4) ten (10) hour days at straight time pay on a permanent basis where allowable under law.

    **(b)** When shifts are worked the first shift shall work eight (8) hours at the regular straight-time rate. The second shift shall work seven and one-half (7½) hours and receive eight (8) hours at the regular straight-time hourly rate. The third shift shall work seven (7) hours and receive eight (8) hours at the regular straight-time hourly rate. A thirty (30) minute lunch period shall be mutually agreed upon by the Job Superintendent and the Union Representative and shall not be considered as time worked. District Council or Local Union Agreement provisions regarding minimum number of days to establish shifts are waived for work under this Agreement. By mutual consent of the Employer and the Union, the starting and quitting times of any shift, including day work, may be changed for all or any portion of a particular job.

    **(c)** For the purpose of this Article, the standard work day of eight (8) hours for the job or portion thereof to which any such change of starting time applies shall begin with such agreed starting time, unless the Local Collective Bargaining Agreement allows for four (4) ten (10) hour days in which case the overtime and the shift requirements for this Article will be locally agreed to with a copy of such agreement filed with the appropriate signatures in the IUPAT offices.

*(d)* When the Local Collective Bargaining Agreement speaks to breaks, the following shall apply: A non-organized fifteen (15) minutes break is to be allowed each mid morning. This break is to be taken at the assigned place of work. In an effort to maintain productivity, safety, and hygiene on full containment jobs or jobs where employees would need to change clothes or travel an extensive distance to safely take a break, then there shall be no mid morning break. When the above situation exists, then the fifteen (15) minutes will be added to the lunch period. While the regular half hour lunch period is unpaid time, these additional fifteen (15) minutes shall be paid time. The above system, in lieu of break, may only be implemented by mutual consent of the employer and the union, on a job-to-job basis.

# SCHEDULE "A"
## NATIONAL BRIDGE AND TUNNEL AGREEMENT

## ARTICLE VI - WAGES, FRINGES AND SUBSISTENCE & WORKING CONDITIONS

*Section 1.* The Employer signatory hereto agrees that wherever the Employer undertakes to perform work covered by **Article II - Scope**, of this Agreement, the wages, fringes and subsistence to be paid to the regular employees will be those that are prevailing in the "home" Local Union of the regular employee. In the event that a higher package of wages, fringes, and subsistence prevails in the locality where the work is being performed, than those prevailing in the "home" Local Union of the regular employee, then the regular employee of the Employer shall receive the higher package.

(a) The Employer signatory hereto agrees that wherever the Employer undertakes to perform work covered by **Article II** of this Agreement, all Local employees shall be paid in accordance with all the terms of the Local Collective Bargaining Agreement as negotiated in the area where the work is to be performed except those specifically covered by this Agreement.

(b) The wage rate to be applied under **Section 1(a)** shall be the rate applicable to bridge work under the applicable Collective Bargaining Agreement.

(c) There shall be three (3) job classifications under this Agreement which will be as follows:

|  | WAGES | FRINGES |
|---|---|---|
| 1. Qualified Journeyman Painters, Blasters or Riggers | 100% | 100% |
| 2. Painter Tender I | 80% | 100% |
| 3. Painter Tender II | 65% | 100% |

(d) Painter Tender I are those hired to tend the employer's equipment. Also, these employees will engage in the building and moving of containment systems. Painter Tender II will clean abrasive blast materials, load and unload trucks, handle all materials, man safety boats, handle traffic control, and other assigned work except work to be performed by qualified Journeyman and Apprentices. Employees in classifications two and three will be paid the above-listed percentage of the applicable rate of pay for Journeyman bridge painters.

(e) The IUPAT agrees to work towards having the wage rates for job classifications 2 & 3 recognized by the State and Federal Departments of Labor as legitimate job classifications and wage rates. However, the IUPAT shall be held harmless in the event that the contracting agency or any government agency does not recognize these rates and demands such employees be paid journeymen wage scale. It shall be the Employer's responsibility to check prior to bidding if the rates are acceptable.

(f)   Qualified Journeymen and Apprentices hired as painters, blasters or riggers shall be paid 100% of the applicable wage as per the Local Agreement at all times regardless of what type of work they are engaged in.  Employees hired in job classifications two (2) or three (3) shall be paid 100% percent of the applicable wage rate when they are engaged in the work of job classification one (1). They shall at no time perform the work in job classification one (1) unless they are qualified and when necessary certified to do so. Apprentices may be used in any job classification at their applicable rate of pay as per the Local Collective Bargaining Agreement.

(g)   During the term of this Agreement, travel pay for employees traveling from one job site to another shall be paid for at the rate of straight time, unless such travel time added to work time exceed forty (40) hours in any one week; then all time in excess of forty (40) hours shall be paid for at the rate of time and one-half.

# RESTATED
# AGREEMENT AND DECLARATION OF TRUST

## Establishing the

## International Painters and Allied Trades

## Industry Pension Fund

This AGREEMENT AND DECLARATION OF TRUST is by and between the INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES (hereinafter referred to as the "Union"), and the FINISHING CONTRACTORS ASSOCIATION (hereinafter referred to as the "F.C.A."), and various employers of members of the union who are or may become parties to this Agreement as hereinafter defined (hereinafter referred to as "Employer" or "Employers").

## WITNESSETH:

WHEREAS, the International Union of Painters and Allied Trades, and/or various Local Unions or District Councils of the Union, and Employers have entered into or expect to enter into collective bargaining agreements which provide, among other things, for the establishment of a Pension Fund and prescribe the contributions or payments to be made by the Employers to such Fund; and

WHEREAS, to accomplish the aforesaid purpose, it is desired to establish a Pension Fund as a Trust Fund for receiving contributions and providing benefits for eligible employees; and

WHEREAS, the said Trust Fund is to be known as the "International Painters and Allied Trades Industry Pension Fund"; and

WHEREAS, it is desired to set forth the terms and conditions under which the said Fund is to

16479-3



be established and administered; and

   WHEREAS, it has been mutually agreed that the Fund shall be administered by Trustees, and it is desired to define the powers and duties of the Trustees and the nature of benefits to be provided;

   NOW, THEREFORE, in consideration of the premises, and the mutual covenants herein contained it is mutually understood and agreed as follows:

## ARTICLE I

   Unless the context or subject matter otherwise requires, the following definitions shall govern in this Agreement:

   *Section 1.*    AGREEMENT AND DECLARATION OF TRUST. The terms "Agreement and Declaration of Trust" or "Trust Agreement" shall mean this instrument, including any amendments hereto and modifications hereof. This Trust Agreement shall govern the operation of both the International Painters and Allied Trades Industry Pension Plan and the International Painters and Allied Trades Industry Annuity Plan.

   *Section 2.*    PENSION FUND. The terms "Pension Fund" or "Fund" shall mean the International Painters and Allied Trades Industry Pension Fund, established by the Trust Agreement and shall mean generally the monies and other items of value which comprise the corpus and additions thereto, contributions payable to the Fund, and amounts received or held for or on behalf of the Trustees under both the International Painters and Allied Trades Industry Pension Plan and the International Painters and Allied Trades Industry Annuity Plan and title to all such monies, and other items of value including contributions owed but not yet received, shall be vested in the Trustees of Fund. The Fund also shall be known as the "IUPAT Industry Pension Fund."

- 2 -

36479-3

*Section 3.*    PENSION PLAN.  The Term "Pension Plan" shall mean the Rules and Regulations of the International Painters and Allied Trades Industry Pension Plan, and any modification, amendment, extension or renewal thereof.  The Pension Plan also shall be known as the "IUPAT Industry Pension Plan."

*Section 4.*    ANNUITY PLAN.  The term "Annuity Plan" shall mean the Rules and Regulations of the International Painters and Allied Trades Industry Annuity Plan and any modification, amendment, extension or renewal thereof.  The Annuity Plan shall also be known as the "IUPAT Industry Annuity Plan."

*Section 5.*    TRUSTEES.

(a)    The term "Employer Trustees" shall mean the Trustees appointed by the Employers who are parties to this Agreement.

(b)    The term "Union Trustees" shall mean the Trustees appointed by the Union.

(c)    The terms "Board of Trustees," "Trustees" and "Board" shall mean the Employer Trustees and the Union Trustees, collectively, and shall include their successors when acting as Trustees.  Except where "United States" or "Canadian" is used in conjunction with them, the terms "Board of Trustees," "Trustees" and "Board" shall mean United States Trustees in matters involving their competence, or Canadian Trustees in matters involving their competence as set forth in Article IV, Section 1.

*Section 6.*    UNION.  The term "Union" shall mean the International Union of Painters and Allied Trades and its affiliated Local Unions and District Councils.

- 3 -

*Section 7.*     CONTRIBUTING EMPLOYER. The term "Contributing Employer" shall mean any person, company or business organization which is or shall become a party to the Trust Agreement and which has agreed or shall agree in a Collective Bargaining Agreement with the Union to make contributions to the Pension Fund. In the case of an employer having more than one place of business, the term "Contributing Employers" shall apply only to the place of business specifically covered by the Collective Bargaining Agreement requiring contributions to the Pension Fund.

*Section 8.*     COLLECTIVE BARGAINING AGREEMENT. The term "Collective Bargaining Agreement" shall mean any written labor contract by and between a Contributing Employer and the Union which provides for contributions to this Pension Fund with any and all extensions or renewals thereof and successor agreements thereto.

*Section 9.*     EMPLOYEE. The term "Employee means: (a) Any person who performs work under a Collective Bargaining Agreement between a Contributing Employer and the Union and for whom the Employer is obligated to make contributions to the Trust; (b) any full-time salaried officer and employee of any Local Union or District Council which is permitted to participate in the Fund in accordance with the Rules and Regulations of the Pension Plan or Annuity Plan; (c) any member of such other class of employees employed by an Employer which is not within the bargaining unit represented by the Union provided that the employee's class is accepted for participation in the Fund in accordance with the Rules and Regulations of the Pension Plan or Annuity Plan. The term "Employee" shall not include any self-employed person, a sole proprietor of or a partner in an unincorporated business, or, unless the Rules and Regulations provide otherwise, a

- 4 -

corporate shareholder who spends less than 50% of his time performing work covered by a collective bargaining agreement.

Section 10.     EMPLOYER CONTRIBUTIONS. The term "Employer Contributions" shall mean payments made or that are required to be made to the Fund, including amounts owed but not yet paid, by a Contributing Employer under the provisions of, or in accordance with, a Collective Bargaining Agreement and the Trust Agreement, or with regard to a Local Union or District Council or special classes of employees of a Contributing Employer, payments to the Fund pursuant to and in accordance with the Rules and Regulations of the Pension Plan and the Annuity Plan. All such Employer Contributions are, and shall be considered as, plan assets from the date on which the hours (whether worked or paid) for which the Contributing Employer is obligated to pay contributions to the Fund accrue , whether or not such Employer Contributions are collected or received by the Fund. No Contributing Employer has any right, title, or interest to any sum payable by the Contributing Employer to the Fund, but not yet paid into the Fund. Title to all Employer Contributions paid into and/or due and owing to the Fund shall be vested in the Trustees of the Fund.

# ARTICLE II

# GENERAL

Section 1.     ESTABLISHMENT OF FUND. As hereby created, the International Painters and Allied Trades Industry Pension Fund shall comprise the entire assets derived from Employer Contributions made or payable to or for the account of this Fund under Collective Bargaining Agreements, together with any and all investments made and held by the Trustees, or monies received or payable to by the Trustees as contributions or as income from investments made and held

36479-3

by the Trustees or otherwise, and any other money or property, received and/or held by the Trustees for the uses, purposes and trust set forth in this Agreement and Declaration of Trust.

Section 2.    GENERAL PURPOSE. The Fund shall be a Trust Fund and shall be used for the purpose of providing Pension and Annuity Benefits, as decided by the Trustees, and shall further provide the means for financing the expenses of the Trustees and the operation and administration of the Fund, in accordance with this Agreement and Declaration of Trust.

# ARTICLE III

# UNITED STATES TRUSTEES

Section 1.    JOINT ADMINISTRATION.  The operation and administration of the Pension Fund shall be the joint responsibility of the Trustees appointed by the Employers and the Trustees appointed by the Union.

Section 2.    ACCEPTANCE OF TRUSTEESHIP.  The Trustees, by affixing their signatures at the end of this Agreement and Declaration of Trust, agree to accept the Trusteeship and act in their capacities strictly in accordance with the provisions thereof. Each additional or successor Trustee shall execute a written acceptance in a form satisfactory to the Trustees and thereby shall be deemed to have accepted the Trust created and established by this instrument and to have consented to act as Trustee or to have agreed to administer the Trust Fund as provided herein.  Such written acceptance shall be filed with the Fund Administrator who shall notify the remaining Trustees of the receipt of such acceptance.

Section 3.    TERMS OF TRUSTEES. Each Trustee shall continue to serve as such until his death, incapacity, resignation, inability to serve pursuant to Section 9 of this Article, or removal,

- 6 -

as hereinafter provided.

Section 4.    The Board of Trustees shall consist of up to 24 Trustees, 12 to be appointed by the Union and 12 to be appointed by the Employers.

Section 5.    UNION TRUSTEES. The Union shall be and is empowered to appoint all Union Trustees.

Section 6.    EMPLOYER TRUSTEES. The F.C.A. shall be and is empowered to appoint all Employer Trustees; provided, however, that the FCA must remain an organization that admits to its membership only 100% Union Signatory Employers in order to maintain its rights hereunder.

Section 7.    REMOVAL OF TRUSTEES. The Union or the F.C.A. may remove any Trustee(s) appointed by it at any time, for any reason, with or without cause.

Section 8.    WHO MAY BE TRUSTEES. At the time of his/her appointment to the Board of Trustees, each Employer Trustee must be signatory to a collective bargaining agreement requiring contributions to this Fund, with a Local Union or District Council in whose geographic jurisdiction its principal place of business is located and such Employer Trustees must also employ an average of twenty-five (25) or more employees. Employer Trustees who satisfy these requirements at the time of their original appointment shall be considered as qualified during their tenure, until removed in accordance with provisions in this Trust. Union Trustees shall be General Officers of the International Union or members of the IUPAT who, in the opinion of the Union, are most likely to conscientiously serve the bests interests of the Fund.

Section 9.    FORM OF NOTIFICATION. In the event any Union Trustees are appointed or removed, a statement in writing by the Union shall be sufficient evidence of the action taken by

- 7 -

36479-3

the Union. In the event any Employer Trustees are appointed or removed, a statement in writing by the Employer or Association empowered to so appoint or remove shall be sufficient evidence of the action taken by said Employer or Association. Any resignation by a Trustee shall be by certified mail, addressed to the office of the Fund.

Section 10.    VESTING OF POWERS AND DUTIES. Any additional or successor Trustee shall, immediately upon his appointment and his acceptance in writing filed with the Trustees, become vested with all the property, rights, powers and duties of a Trustee hereunder with like effect as if originally named as a Trustee and all the Trustees then in office and any Corporate Trustee or Corporate Agent appointed pursuant to Article V, Section 3, of this Trust Agreement and all other necessary persons shall be notified immediately.

# ARTICLE IV

## CANADIAN TRUSTEES

Section 1.    DECISIONS. The Canadian Board of Trustees shall make all decisions, and only such decisions, that affect Canadian participants, retirees and beneficiaries, Canadian Employers and monies contributed by them, and funds maintained in Canada.

Section 2.    APPOINTMENT. The Canadian Board of Trustees shall consist of up to 6 Trustees. The Union may appoint 3 Trustees, 2 of whom shall be Canadian citizens. Canadian Employers may appoint 2 Trustees who shall be Canadian citizens. Employer Trustees of this Fund may appoint 1 Trustee.

Section 3.    REMOVAL. The Union or Employers empowered by this Article to appoint Trustees may remove any Trustee(s) appointed by it or them.

- 8 -

*Section 4.*    WHO MAY BE TRUSTEES. Each Employer Trustee must be signatory to a collective bargaining agreement, requiring contributions to this Fund, with a Local Union or District Council in whose geographic jurisdiction his principal place of business is located. Each Employer Trustee must also employ an average of twenty-five or more employees. Union Trustees shall be General Officers of the International Union or members of the IUPAT who, in the opinion of the Union, are most likely to conscientiously serve the bests interests of the Fund.

*Section 5.*    PROCEDURES. The procedures, rights and obligations set forth in Article III, Sections 2, 3, 9 and 10, shall apply to this Board of Trustees.

36479-3

# ARTICLE V

## POWERS, DUTIES AND OBLIGATIONS OF TRUSTEES

*Section 1.*    PROPERTY AND ASSISTANCE.   The Trustees are authorized and empowered to lease or purchase such premises, materials, supplies and equipment, and to hire and employ and retain such legal counsel, investment manager or counsel, administrative, accounting, actuarial, clerical and other assistants or employees as in their discretion they may find necessary or appropriate in the performance of their duties and to pay the costs thereof out of the Fund.

*Section 2.*    CONSTRUCTION OF AGREEMENT. The Trustees shall have the power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein and any construction adopted by the Trustees in good faith shall be binding upon the Union, the Contributing Employers, the employees and their families, dependents, beneficiaries and/or legal representatives.

*Section 3.*    GENERAL POWERS.  The Trustees are hereby empowered, in addition to other such powers as set forth herein or conferred by law:

(a) to establish and administer a Pension Fund, and Pension and Annuity Plans, on behalf of the Employees referred to in this instrument;

(b) to enter into any and all contracts and agreements for carrying out the terms of this Agreement and Declaration of Trust and for the administration of the Pension Fund and to do all acts as they, in their discretion, may deem necessary and advisable;

(c) to compromise, settle, arbitrate and release claims or demands in favor of or against the Pension Fund or the Trustees on such terms and conditions as the Trustees may deem advisable;

- 10 -

(d) to establish and accumulate as part of the Pension Fund a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purpose of such Trust;

(e) to pay out of the Pension Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund or any money, property, or securities forming a part thereof;

(f) to make appropriate allocations of common administrative expenses and disbursements shared or to be shared with any other Plan or Fund;

(g) to receive contributions or payments from any source whatsoever to the extent permitted by law;

(h) to invest and reinvest the Pension Funds in any type of investments and to take any and all action with respect to holding, buying, selling or maintaining such investments as they, in their sole discretion, may deem appropriate;

(i) to procure a group annuity contract or contracts in accordance with the Insurance Code of the District of Columbia for the purpose of providing some or all of the benefits to be provided under this Pension Fund and/or appoint a bank or banks or trust company or trust companies to be designated as (1) "Corporate Trustee," and to enter into and execute a trust agreement or agreements with such bank or banks or trust company or trust companies, to provide for the investment and reinvestment of assets of the Pension Fund with such other provisions incorporated therein as may be deemed desirable in the Trustee's sole discretion for the proper management of the Pension Fund and without limit with respect to the powers which the Trustees may grant to such Corporate Trustee, in such agreement to the extent permitted by law; or as (2) "Corporate Agent";

- 11 -

36479-3

(j) to do all acts, whether or not expressly authorized herein, that the Trustees may deem necessary or proper for the protection of the property held hereunder;

(k) to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish to the general objective of enabling the employees to obtain pension and annuity benefits in the most efficient and economical manner.

Section 4.    COMPENSATION. The Union and Employer Trustees shall not receive compensation for the performance of their duties. However, they may be reimbursed for reasonable out-of-pocket travel and incidental expenses in connection with their duties as Trustees.

Section 5.    AUTHORITY TO ENTER INTO AGREEMENTS WITH OTHER TRUSTEES. The Trustees are hereby given authority to enter into agreements with Trustees of other Pension Funds to which the Union is a party to permit such other Pension Funds to join or merge with the Pension Fund.

Section 6.    PERSONAL LIABILITY. The liability, if any, of the Board of Trustees or any individual Trustee or Trustees shall be governed by the following provisions to the extent permissible by applicable Federal law: Neither the Trustees nor any individual or Successor Trustee shall be personally answerable or personally liable for any liabilities or debts of the Fund contracted by them as such Trustees, or for the non-fulfillment of contracts, but the same shall be paid out of the Fund and the Fund is hereby charged with a first lien in favor of such Trustee for his or their security and indemnification for any amounts paid out by any such Trustee for any such liability and for his and their security and indemnification against any liability of any kind which the Trustees or any of them may incur hereunder, including cost of defense of litigation; provided, however, that nothing

- 12 -

36479-3

herein shall exempt any Trustee from liability arising out of his own willful misconduct, bad faith or gross negligence, or entitle such Trustee to indemnification for any amounts paid or incurred as a result thereof.

The Trustees and each individual Trustee shall not be liable for any error of judgment or for any loss arising out of any act or omission in the execution of their duties, except in case of willful misconduct, bad faith or gross negligence; nor shall any Trustee, in the absence of his own willful misconduct, bad faith or gross negligence, be personally liable for the acts or omissions (whether performed at the request of the Trustees or not) of any other Trustee, or of any agent or attorney elected or appointed by or acting for the Trustees.

The Trustees shall be fully protected in acting upon any instrument, certificate or paper believed by them to be genuine and to be signed or presented by the proper person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Neither the Employers, nor the Union, shall in any way be liable in any respect for any of the acts, omissions or obligations of the Trustees, individually or collectively.

The Trustees may from time to time consult with the Trust's legal counsel and shall be fully protected in acting upon such advice of counsel to the Trust as respects legal questions.

Section 7.    BOOKS OF ACCOUNT. The Trustees shall keep true and accurate books of account and records of all their transactions, which shall be audited annually or more often by a certified public accountant selected by the Trustees. A copy of such audit shall be available at all

36479-3

times upon reasonable notice for inspection by signatories to this Agreement at the principal office of the Fund.

Section 8.    EXECUTION OF DOCUMENTS.  The Trustees may authorize an Employer Trustee and a Union Trustee or any joint group equally composed of Employer and Union Trustees to execute jointly any notice or other instrument in writing and all persons, partnerships, corporations or associations may rely thereupon that such notice or instrument has been duly authorized and is binding on the Pension Fund and the Trustees.

Section 9.    DEPOSIT AND WITHDRAWAL OF FUNDS.  All monies received by the Trustees hereunder shall be deposited by them in such bank or banks as the Trustees may designate for that purpose and all withdrawals of monies from such account or accounts shall be made only by checks signed by the Trustees authorized in writing by the Trustees to sign such checks.  No check shall be valid unless signed by two persons of whom one shall be a Union Trustee and one an Employer Trustee, except when signed by a designated employee as provided in this Section.

The Employer Trustees shall designate in writing the name or names of any Employer Trustee who may sign checks in the above manner, and the Union Trustees shall likewise designate in writing the name or names of the Union Trustee who may sign checks in the above manner.

The Trustees may, in their discretion, designate and authorize an employee of the Fund to sign checks upon such separate and specific bank account or bank accounts as the Trustees may designate and establish for that purpose.

Section 10.    SURETY BONDS.  The Trustees and any employees of the Trustees who are empowered and authorized to sign checks as aforesaid shall each be bonded by a duly authorized

- 14 -

36479-3

surety company in such amount as may be determined from time to time by the Trustees. Each such employee employed by the Trustees who may be engaged in handling monies of the Pension Fund shall also be bonded by a duly authorized surety company in the same manner. The cost of the premium on such bonds shall be paid out of the Pension Fund.

## ARTICLE VI

## CONTRIBUTIONS TO THE PENSION FUND

*Section 1.*      RATE OF CONTRIBUTIONS. In order to effectuate the purpose hereof, each Employer shall contribute to the Pension Fund the amount required by the Collective Bargaining Agreement between the Union and the Employer. The rate of contribution shall at all times be governed by the aforesaid Collective Bargaining Agreement then in force and effect, together with any amendments, supplements or modification thereto. On matters other than contribution rates, contributions to the Pension Plan shall be governed by the Rules and Regulations of the Pension Plan; contributions to the Annuity Plan shall be governed by the Rules and Regulations of the Annuity Plan.

*Section 2.*      EFFECTIVE DATE OF CONTRIBUTIONS. All contributions shall be made effective as required by the Collective Bargaining Agreement and shall continue to be paid as long as the Employer is so obligated pursuant to the Collective Bargaining Agreement with the Union or until he ceases to be an Employer within the meaning of this Agreement and Declaration of Trust, as hereinafter provided.

*Section 3.*      MODE OF PAYMENT. All contributions shall be payable to the "IUPAT Industry Pension Fund" and shall be paid in the manner and form determined by the Trustees.

- 15 -

36479-3

*Section 4.*    DEFAULT IN PAYMENT.    Non-payment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payment. In addition to any other remedies to which the parties may be entitled, an Employer in default for twenty days may be required at the discretion of the Trustees to pay such reasonable rate of interest as the Trustees may fix on the money due to the Trustees from the date when the payment was due to the date when payment is made, together with all expenses of collection (including attorneys' fees) incurred by the Trustees and such liquidated damages or penalties as may be assessed by the Trustees.

*Section 5.*    REPORT ON CONTRIBUTIONS.    The Employers shall make all reports on contributions in such manner and form as required by the Trustees.

*Section 6.*    AUDITS.    The Trustees may at any time have an audit made by certified public accountants of the payroll, wage and cash disbursement records, general ledger, and other financial records, including but not limited to tax returns, of any Employer in connection with the said contributions and/or reports. When an Employer receives notice that the Employer is scheduled for an audit, the Employer may write to the Fund 1) explaining why the time or date for the audit is impossible for the Employer to comply with and 2) offering alternative times or dates for an audit within a reasonable time. If the Fund does not receive such a written response from the Employer within 48 hours before the scheduled audit, the certified public accountants responsible for the audit may proceed as scheduled. If the Employer fails to cooperate with a scheduled audit, the Trustees may require that the Employer pay to the Fund all costs incurred as a result of the Employer's failure. Any Employer found delinquent or in violation of the Rules and Regulations of the Pension Plan

- 16 -

and/or the Annuity Plan as a result of an audit may be required by the Trustees to pay to the Fund the cost of the audit.

# ARTICLE VII

# PLAN OF BENEFITS

*Section 1.*      BENEFITS. The Trustees shall have full authority to determine all questions of the nature, amount and duration of benefits to be provided, based on what is estimated the Fund can provide without undue depletion or excess accumulation; provided, however, that no benefits other than pension, annuity, death, disability and severance benefits may be provided for or paid under this Agreement and Declaration of Trust.

*Section 2.*      RECIPIENTS OF BENEFITS. Benefits may be provided in accordance with Section 1 of this Article for any employee of a Contributing Employer covered by a Collective Bargaining Agreement between the Employer and the Union or other classes of employee defined in Article I, Section 9(a), (b) and (c).

*Section 3.*      ELIGIBILITY REQUIREMENTS FOR BENEFITS. The Trustees shall have full authority to determine eligibility requirements for benefits and to adopt rules and regulations setting forth same which shall be binding on the employees and their beneficiaries.

*Section 4.*      METHOD OF PROVIDING BENEFITS. The benefits shall be provided and maintained by such means as the Trustees shall in their sole discretion determine.

*Section 5.*      WRITTEN PLAN OF BENEFITS. The detailed basis on which payment of benefits is to be made pursuant to this Agreement shall be specified in writing by appropriate action of the Trustees subject, however, to such changes or modifications by the Trustees from time to time

- 17 -

36479-3

as they in their discretion may determine.  All such changes or modifications shall similarly be specified in writing by appropriate resolution of the Trustees.

Section 6.    APPROVAL OF PLAN.  (a) United States: The Pension Plan and Annuity Plan adopted by the Trustees shall be such as will qualify for approval by the Internal Revenue Service, U.S. Treasury Department, and will continue as qualified Plans, so as to ensure that the Employer contributions to the Pension Fund are proper deductions for income tax purposes.  The Trustees are authorized to make whatever applications are necessary with the Internal Revenue Service to receive and maintain approval of the Pension Plan and the Annuity Plan. (b) Canada: The Pension Plan and Annuity Plan shall be such as will qualify for approval by Revenue Canada and for registration, as appropriate, under Provincial legislation.

Section 7.    LIMIT OF EMPLOYER'S LIABILITY.  Except for withdrawal liability and delinquency liability provided by law, and except as provided in Article VI, the financial liability of any Employer shall in no event exceed the obligation to make contributions as set forth in its applicable Collective Bargaining Agreement with the Union.

## ARTICLE VIII

## MEETING AND DECISION OF TRUSTEES

Section 1.    OFFICERS OF TRUSTEES.  The Trustees shall elect two Co-Chairmen, one from among the Union Trustees and the other from among the Employer Trustees.  The terms of such officers shall commence on the date of their election and continue until his or their successors have been elected.

Section 2.    MEETING OF TRUSTEES.  Meetings of the Trustees shall be held at such

- 18 -

36479-3

place or places as may be agreed upon by the Co-Chairmen and may be called by the said officers upon twenty (20) days' notice to the other Trustees and may be held at any time without such notice if all the Trustees consent thereto in writing. The Co-Chairmen may also convene a meeting of the Trustees by telephone conference called upon five (5) days notice to the other Trustees.

Section 3.    ACTION BY TRUSTEES WITHOUT MEETING. Action by the Trustees may also be taken by them in writing without a meeting; provided, however, that in such cases there shall be unanimous written concurrence by all the Trustees.

Section 4.    QUORUM (UNITED STATES). In all meetings of the Trustees, two Trustees shall constitute a quorum for the transaction of business providing that there is at least one Employer and one Union Trustee present at the meeting. The vote of any absent Trustee shall be cast by the Trustees present, designated by the same party with the same force as if such absent Trustee was present. If at any time there is an unequal number of Employer and Union Trustees appointed, the Employer Trustees and the Union Trustees shall have equal voting strength with the difference in the number appointed treated as absent Trustees.

Section 5.    MAJORITY VOTE OF TRUSTEES (UNITED STATES). All action by the Trustees shall be by majority decision of the Employer and Union Trustees. Such majority vote shall govern not only this Article but any portion of this Agreement and Declaration of Trust which refers to action by the Trustees. In the event any matter presented for decision cannot be decided because of a tie vote, or because of the lack of quorum at two consecutive meetings, the matter shall be submitted to arbitration as hereinafter provided.

Section 6.    QUORUM AND VOTING (CANADA). In all meetings of the Canadian

- 19 -

36479-3

Trustees, two Trustees shall constitute a quorum for the transaction of business. All action by the Trustees shall be by unit vote, with the Union Trustees having 1 vote and the Employer Trustees having 1 vote. How each such vote is cast shall be decided by majority vote within each respective unit. In the event any matter presented for decision cannot be decided because of a tie vote, or because of the lack of quorum at two consecutive meetings, the matter shall be submitted to arbitration as hereinafter provided.

*Section 7.*    MINUTES OF MEETINGS. The Trustees shall keep minutes of all meetings but such minutes need not be verbatim. Copies of the minutes shall be sent to all Trustees.

## ARTICLE IX

## IMPARTIAL ARBITRATOR

*Section 1.*    APPLICATION OF THIS ARTICLE. If the Trustees cannot agree on an arbitrator, either the Employer Trustees or the Union Trustees or both may apply to the District Court of the United States for the District in the area in which the Fund maintains its principal office (the Canadian Trustees may apply to the competent court in the jurisdiction of the Courts of Ontario) for the designation of an arbitrator who will decide any dispute among the Trustees or any other matter submitted to arbitration in accordance with the provisions of Article VIII, Sections 5 or 6. The decision of the arbitrator shall be final and binding.

*Section 2.*    EXPENSES OF ARBITRATION. The cost and expense incidental to any arbitration proceedings, including the fee, if any, of the impartial arbitrator, shall be proper charges against the Fund and the Trustees are authorized to pay such charges.

- 20 -

36479-3

## ARTICLE X

## EXECUTION OF AGREEMENT AND DECLARATION OF TRUST

*Section 1.*     COUNTERPARTS   This Agreement and Declaration of Trust may be executed in any number of counterparts.  The signature of a party on any counterpart shall be sufficient evidence of his execution thereof.

*Section 2.*     WRITTEN INSTRUMENT.  An Employer may adopt and become a party to this Agreement and Declaration of Trust by executing a counterpart hereof or by executing any other written instrument wherein he agrees to participate in the Fund pursuant to the terms of this Agreement and Declaration of Trust, and upon written notification from the Trustees that he has been accepted as a Contributing Employer.

*Section 3.*     EFFECTIVE DATE.  The effective date of this Restated Agreement and Declaration of Trust is April 1, 2002.  This Restated Agreement and Declaration of Trust continues in effect, except as modified herein and by amendments duly adopted from time to time, the provisions of an Agreement and Declaration of Trust effective April 1, 1967.

## ARTICLE XI

## AMENDMENT TO AGREEMENT AND DECLARATION OF TRUST

*Section 1.*     AMENDMENT BY TRUSTEES. This Agreement and Declaration of Trust may be amended in any respect from time to time by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees.  As to any amendment, the Trustees, in their discretion, shall have power to fix the effective date thereof.  Notice of the proposed amendment shall be given at the time the notice of the meeting is given, unless waived by the Trustees.

- 21 -

36479-3

Section 2.    LIMITATION OF RIGHT TO AMENDMENT.  No amendment may be adopted which will be in conflict with the Collective Bargaining Agreements with the Union to the extent that such agreements affect contributions to the Fund created hereunder, be contrary to the laws governing trust funds of this nature, or be contrary to any agreements entered into by the Trustees.  Under no circumstances shall any amendment be adopted which will in any way alter Article XIII, Section 1.

Section 3.    NOTIFICATION OF AMENDMENT.  Whenever an amendment is adopted in accordance with this Article, a copy thereof shall be distributed to all Trustees, and the Trustees shall so notify all necessary parties and shall execute any instrument or instruments necessary in connection therewith.

# ARTICLE XII

# TERMINATION OF TRUST

Section 1.    BY THE TRUSTEES.  This Agreement and Declaration of Trust may be terminated by an instrument in writing executed by all the Trustees when there is no longer in force and effect a Collective Bargaining Agreement between an Employer and the Union requiring contributions to the Fund.

Section 2.    BY THE PARTIES.  This Agreement and Declaration of Trust may be terminated by an instrument in writing duly executed by the Employers and the Union.

Section 3.    PROCEDURE ON TERMINATION.  In the event of the termination of this Agreement and Declaration of Trust, the Trustees shall apply the Fund to pay or to provide for the payment of any and all obligations of the Fund and shall distribute and apply any remaining surplus

- 22 -

36479-3

in such manner as will, in their opinion, best effectuate the purpose of the Fund; provided, however, that no part of the corpus or income of said Fund shall be used for or diverted to purposes other than for the exclusive benefits of the employees, their families, beneficiaries or dependents, or the administrative expenses of the Fund or for other payments in accordance with the provisions of the Fund.

Section 4.    NOTIFICATION OF TERMINATION   Upon termination of the Fund in accordance with this Article, the Trustees shall forthwith notify each Local Union and/or District Council of the Union and each Employer, who are parties hereto, and also all other necessary parties; and the Trustees shall continue as Trustees for the purpose of winding up the affairs of the Trust.

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

Section 1.    NON-REVERSION.  Under no circumstances shall any portion of the corpus or income of the Fund, directly or indirectly, revert or accrue to the benefit of any Contributing Employer or Local Union, and/or District Council or the Union.

Section 2.    TERMINATION OF INDIVIDUAL EMPLOYERS. An Employer shall cease to be an Employer within the meaning of this Agreement and Declaration of Trust when he is no longer obligated, pursuant to a Collective Bargaining Agreement with the Union, to make contributions to this Pension Fund, or, as determined by the Trustees, when he is delinquent in his contributions or reports to the Pension Fund.

Section 3.    VESTED RIGHTS.  No Employee or any person claiming by or through such Employee, including his family, dependents, beneficiary and/or legal representative, shall have any

- 23 -

36479-3

right, title or interest in or to the Pension Fund or any property of the Pension Fund or any part thereof except as may be specifically determined by the Trustees.

Section 4.    ENCUMBRANCE OF BENEFITS. No monies property or equity of any nature whatsoever, in the Pension Fund, or contracts or benefits or monies payable therefrom, shall be subject in any manner by an Employee or person claiming through such Employee to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same subject thereto shall be null and void, except for a qualified domestic relations order issued by a court of competent jurisdiction pursuant to law.

Section 5.    SITUS. The City of Washington, D.C., shall be deemed the situs of the Trust Fund created hereunder. All questions pertaining to validity, construction and administration shall be determined in accordance with federal law or, when applicable, the laws of the District of Columbia.

Section 6.    CONSTRUCTION OF TERMS. Whenever any words are used in this Agreement and Declaration of Trust in the masculine gender, they shall be construed as though they were also in the feminine gender or neuter in all situations where they would so apply, and wherever any words are used in this Agreement and Declaration of Trust in the singular form, they shall be construed as though they were also used in the plural form in all situations where they would so apply, and wherever any words are used in the Agreement and Declaration of Trust in the plural form, they shall be construed as though they were also used in the singular form in all situations where they would so apply.

Section 7.    CERTIFICATION OF TRUSTEES' ACTIONS. The Co-Chairmen of the

- 24 -

36479-3

Trustees may execute any certificate or document jointly on behalf of the Trustees and such execution shall be deemed execution by all the Trustees. All persons having dealings with the Pension Fund or with the Trustees shall be fully protected in reliance placed on such duly executed documents.

Section 8.    NOTIFICATION TO TRUSTEES. The address of each of the Trustees shall be that stated on the signature page of this Agreement and Declaration of Trust. Any change of address shall be effected by written notice to the Trustees.

Section 9.    SEVERABILITY. Should any provision in this Agreement and Declaration of Trust or in the Plan or Rules and Regulations adopted thereunder or in any Collective Bargaining Agreement be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the provisions herein and therein contained unless such illegality shall make impossible or impractical the functioning of the Trust and the Plan, and in such case the appropriate parties shall immediately adopt a new provision to take the place of the illegal or invalid provision.

Section 10.    TITLES. The title headings to the various Sections and Articles are for the purpose of convenience only and shall not have any legal significance apart from the text.

IN WITNESS THEREOF, the undersigned to hereby cause this instrument to be executed.

FOR THE INTERNATIONAL
UNION OF PAINTERS AND
ALLIED TRADES

BY: _James A. Williams_
        James A. Williams
        General President

FOR THE FINISHING CONTRACTORS
ASSOCIATION

BY: _John J. Frye_
        John Frye
        Chairman

- 25 -

36479-3

# INTERNATIONAL PAINTERS AND ALLIED TRADES
## INDUSTRY PENSION FUND

United Unions Building, Suite 501
1750 New York Avenue, NW
Washington, DC 20006

Telephone: (202) 783-4884

## UNITED STATES TRUSTEES

James A. Williams
Co-Chairman

Alvin Levine
Co-Chairman

**Union Trustees**

**Employer Trustees**

Kenneth E. Rigmaiden
George Galis
William D. Candelori, Jr.
Robert Kucheran
Raymond J. Price, III
Raymond Sesma

Aristotle G. Aivaliotis
Joseph Brescia
Robert L. Cusumano
Richard A. Grund
Michael LeGood
Leo J. Manta
Steve Sharpe

## CANADIAN TRUSTEES

James A. Williams
Co-Chairman

Alvin Levine
Co-Chairman

**Union Trustees**

**Employer Trustees**

Robert Kucheran
William Nicholls

Adolf Gust
Richard Pazdzierski

# International Painters And Allied Trades Industry Pension Plan



## Rules and Regulations
as amended and restated as of January 1, 2003



# IUPAT INDUSTRY PENSION PLAN                                            PAGE i

## TABLE OF CONTENTS

**ARTICLE 1.    ESTABLISHMENT & CONSTRUCTION** .................................................. 1

Section 1.01    Establishment of Plan and Name ................................................ 1
Section 1.02    Purpose ............................................................................. 1
Section 1.03    Trustees ............................................................................. 1
Section 1.04    Plan Effective Date ............................................................... 1
Section 1.05    Amendment of Plan ............................................................... 2
Section 1.06    Prohibited Amendments .......................................................... 2
Section 1.07    Merger or Transfer of Plan Assets ............................................. 2
Section 1.08    Termination of Plan ............................................................. 2
Section 1.09    Termination Actions ............................................................. 3
Section 1.10    Notices ............................................................................. 3
Section 1.11    Unauthorized Representations .................................................. 3
Section 1.12    Construction ...................................................................... 3
Section 1.13    Choice of Law ..................................................................... 4
Section 1.14    Severability ....................................................................... 4

**ARTICLE 2.    ADMINISTRATION** ............................................................... 4

Section 2.01    Powers Of Trustees ............................................................. 4
Section 2.02    Duties and Powers of Plan Administrator ...................................... 5
Section 2.03    Discretion ......................................................................... 5
Section 2.04    Consultants ....................................................................... 5
Section 2.05    Delegation and Allocation of Responsibility ................................. 5
Section 2.06    Reliance ........................................................................... 5
Section 2.07    Limitation of Liability .......................................................... 5
Section 2.08    Indemnity .......................................................................... 6

**ARTICLE 3.    PARTICIPATION** .................................................................. 6

Section 3.01    Eligible Employees .............................................................. 6
Section 3.02    Entry Date ......................................................................... 7
Section 3.03    Termination of Participation .................................................. 7
Section 3.04    Reinstatement of Participation ................................................ 7
Section 3.05    Acceptance of a New Contributing Employer .................................. 8
Section 3.06    Acceptance of A New Affiliated Employer ..................................... 8
Section 3.07    Additional Conditions ........................................................... 9
Section 3.08    Delinquent Employers ........................................................... 9
Section 3.09    Mergers ............................................................................ 10

**ARTICLE 4.    VESTING** .......................................................................... 10

Section 4.01    Vested Participant ............................................................... 10
Section 4.02    Service Vesting ................................................................... 10
Section 4.03    Age Vesting ....................................................................... 11
Section 4.04    Termination Vesting ............................................................. 11
Section 4.05    Vesting Changes .................................................................. 11
Section 4.06    Years of Vesting Service ....................................................... 11
Section 4.07    One-Year Break-in-Service ..................................................... 12
Section 4.08    Effect of One-Year Break ....................................................... 12
Section 4.09    Cure of One-Year Break ......................................................... 12
Section 4.10    Family and Medical Leave ....................................................... 13
Section 4.11    Qualified Military Service ..................................................... 13
Section 4.12    Permanent Break in Service ..................................................... 14

# IUPAT INDUSTRY PENSION PLAN                                    PAGE ii

| | | |
|---|---|---|
| Section 4 13 | Effect of Permanent Break | 14 |
| **ARTICLE 5.** | **ACCRUED PENSION BENEFIT CALCULATION** | **15** |
| Section 5.01 | Accrued Benefit | 15 |
| Section 5.02 | Pension Benefit for Service before the Contribution Period - Qualification | 16 |
| Section 5 03 | Pension Benefit Credit for Service before the Contribution Period - Amount | 17 |
| Section 5.05 | Benefit Credit for Service during the Contribution Period | 19 |
| Section 5.06 | Maximum Contribution Rates | 19 |
| Section 5.07 | Extra Contributions | 20 |
| Section 5.08 | Contribution Rate | 20 |
| Section 5.09 | Contribution Rate Changes | 20 |
| Section 5.10 | Benefit Break-In-Continuity | 21 |
| Section 5.11 | New Groups | 22 |
| Section 5.12 | Reciprocal Pension Agreements | 22 |
| Section 5.13 | Merger Agreements | 23 |
| Section 5.14 | Post-Retirement Benefit Increases | 23 |
| **ARTICLE 6.** | **PENSION BENEFIT PAYMENT** | **24** |
| Section 6.01 | Normal Retirement Pension – Eligibility | 24 |
| Section 6 02 | Normal Retirement Age | 24 |
| Section 6.03 | Normal Retirement Pension – Amount | 24 |
| Section 6.04 | Late Retirement Pension – Eligibility | 25 |
| Section 6.05 | Late Retirement Pension – Amount | 25 |
| Section 6.06 | Mandatory Payment of Benefits | 25 |
| Section 6.07 | Mandatory Payment - Amount | 26 |
| Section 6.08 | Special Early Retirement Pension - Eligibility | 27 |
| Section 6.09 | Special Early Retirement Pension - Amount | 28 |
| Section 6.10 | Early Retirement Pension —Eligibility | 28 |
| Section 6.11 | Early Retirement Pension - Amount | 28 |
| Section 6.12 | Disability Pension — Eligibility | 29 |
| Section 6.13 | Disability Pension - Amount | 30 |
| Section 6.14 | Effect of Recovery by a Disabled Pensioner | 30 |
| Section 6.15 | Early Vested Pension – Eligibility | 31 |
| Section 6.16 | Early Vested Pension - Amount | 31 |
| Section 6.17 | Partial Pension - Eligibility | 32 |
| Section 6.18 | Partial Pension - Amount | 32 |
| Section 6.19 | Partial Pension – Payment Forms | 32 |
| Section 6.20 | Non-Duplication of Pensions | 32 |
| Section 6.21 | Taxes | 33 |
| **ARTICLE 7.** | **STANDARD PENSION PAYMENT FORMS** | **33** |
| Section 7.01 | General Payment Restrictions | 33 |
| Section 7.02 | Commencement of Benefits Generally | 33 |
| Section 7.03 | Married Participants - General Rules | 34 |
| Section 7.04 | Single Participants - General Rules | 34 |
| Section 7.05 | Small Benefits | 34 |
| Section 7.06 | Husband-and-Wife Pension at Retirement — Standard Form of Benefit Payment for Married Participants | 35 |
| Section 7.07 | Waiver of Husband-and-Wife Pension | 35 |
| Section 7.08 | Pre-retirement Surviving Spouse Pension | 37 |
| Section 7.09 | Waiver of Pre-retirement Surviving Spouse Pension | 37 |
| Section 7.10 | Pre-retirement Surviving Spouse Pension – Spouse Alternatives | 38 |
| Section 7.11 | Qualified Domestic Relations Orders | 39 |

# IUPAT INDUSTRY PENSION PLAN                          PAGE  iii

| | | |
|---|---|---|
| Section 7.12 | Qualified Domestic Relations Order Procedures | 39 |
| Section 7.13 | Guaranteed Five-Year Pension (Unreduced Pension) — Standard Form of Benefit Payment for Unmarried Participants | 40 |
| Section 7.14 | Pre-Retirement Death Benefit - Eligibility | 40 |
| Section 7.15 | Post-Retirement Death Benefit – Amount | 41 |
| Section 7.16 | Beneficiary | 41 |
| Section 7.17 | Retirement and Suspension of Benefits Before Normal Retirement Age | 42 |
| Section 7.18 | Pensioner Reporting of Work Before Normal Retirement Age | 42 |
| Section 7.19 | Resumed Benefits Before Normal Retirement Age - Eligibility | 43 |
| Section 7.20 | Resumed Benefits Before Normal Retirement Age - Amount | 43 |
| Section 7.21 | Suspension of Benefits after Normal Retirement Age | 44 |
| Section 7.22 | Plan Disclosure of Suspension Rules | 45 |
| Section 7.23 | Pensioner Reporting of Work after Normal Retirement Age | 45 |
| Section 7.24 | Advance Determinations of Suspendible Work | 46 |
| Section 7.25 | Plan Notice of Suspension after Normal Retirement Age | 46 |
| Section 7.26 | Resumption of Benefit Payments after Normal Retirement Age - Eligibility | 46 |
| Section 7.27 | Resumption of Benefit Payments after Normal Retirement Age - Amount | 47 |
| Section 7.28 | Waiver of Suspension | 48 |
| Section 7.29 | Incompetence or Incapacity of a Pensioner or Beneficiary | 48 |
| Section 7.30 | Non-Assignment of Benefits | 48 |
| Section 7.31 | Payments to Minors | 49 |
| | | |
| ARTICLE 8. | OPTIONAL FORMS OF PENSION PAYMENT | 49 |
| | | |
| Section 8.01 | General | 49 |
| Section 8.02 | Joint and Survivor Options | 50 |
| Section 8.03 | Social Security (Level Income) Option | 52 |
| Section 8.04 | Combined Level Income and Joint and Survivor Option | 52 |
| Section 8.05 | Ten Year Certain Option | 53 |
| Section 8.06 | Lump Sum Payment Option | 53 |
| Section 8.07 | Benefit Payment Restrictions | 54 |
| Section 8.08 | Trustee-to-Trustee Transfers - Rollovers | 58 |
| | | |
| ARTICLE 9. | CLAIMS PROCEDURE & BENEFIT PAYMENTS | 60 |
| | | |
| Section 9.01 | Application | 60 |
| Section 9.02 | Partial Pension - Application Procedure | 60 |
| Section 9.03 | Information and Proof | 60 |
| Section 9.04 | Trustee Discretion and Authority | 60 |
| Section 9.05 | Initial Claim Determination | 61 |
| Section 9.06 | Request for Review | 61 |
| Section 9.07 | Decision on Review | 61 |
| Section 9.08 | Administrative Delay | 62 |
| Section 9.09 | No Rights to Assets | 62 |
| | | |
| ARTICLE 10. | FUNDING | 62 |
| | | |
| Section 10.01 | Funding Policy | 62 |
| Section 10.02 | Trust for Participants | 62 |
| Section 10.03 | Investments | 62 |
| Section 10.04 | Source of Benefit Payments | 63 |
| Section 10.05 | Expenses | 63 |
| Section 10.06 | Non-Reversion | 63 |
| Section 10.07 | Employer Contributions | 63 |
| Section 10.08 | Irrevocability of Contributions | 63 |
| Section 10.09 | Qualified Military Service Contributions | 63 |

# IUPAT INDUSTRY PENSION PLAN

PAGE iv

Section 10.10  Return of Mistaken Contributions .................................................................... 64
Section 10.11  Delinquent Employers .................................................................................... 64
Section 10.12  Collection of Delinquent Contributions ............................................................ 65

ARTICLE 11.     CONTRIBUTING EMPLOYER WITHDRAWAL ............................................ 66

Section 11.01  Employer Withdrawal - In General ................................................................... 66
Section 11.02  Control Group Employer - Definition ................................................................ 66
Section 11.03  Construction Industry Employers - Definition ................................................... 66
Section 11.04  Complete Withdrawal - Defined ...................................................................... 66
Section 11.05  Partial Withdrawal - Defined .......................................................................... 67
Section 11.06  Unfunded Vested Liability .............................................................................. 67
Section 11.07  Title IV Vested Benefits ................................................................................. 67
Section 11.08  Initial Unfunded Vested Liability ..................................................................... 68
Section 11.09  Annual Change in Unfunded Vested Liability .................................................... 68
Section 11.10  Reallocated Liability ...................................................................................... 68
Section 11.11  Mergers ....................................................................................................... 69
Section 11.12  Amount of Control Group Employer Liability for Complete Withdrawal .............. 69
Section 11.13  Employer Proportionate Share of Initial Unfunded Vested Liability ................... 70
Section 11.14  Employer Proportionate Share of Annual Changes in Unfunded Vested Liability ... 70
Section 11.15  Apportionment Base Period ............................................................................ 71
Section 11.16  Base Period Employer Contributions ............................................................... 71
Section 11.17  Pre-1980 Terminated Unit Contributions .......................................................... 72
Section 11.18  Employer Proportionate Share of Annual Charges for Reallocated Liability ......... 72
Section 11.19  Transfers of Liability ..................................................................................... 72
Section 11.20  De Minimis Reduction ................................................................................... 73
Section 11.21  20-Year Payment Limitation ........................................................................... 73
Section 11.22  Insolvency Reduction .................................................................................... 73
Section 11.23  Partial Withdrawal Liability - Amount ............................................................. 73
Section 11.24  Payment of Withdrawal Liability ..................................................................... 73
Section 11.25  Notice and Collection of Withdrawal Liability ................................................... 74
Section 11.26  Withdrawal Liability Review ........................................................................... 74
Section 11.27  Withdrawal Liability Arbitration ...................................................................... 75
Section 11.28  Withdrawal Liability Default ........................................................................... 75
Section 11.29  Withdrawal Liability Collection Litigation ......................................................... 75
Section 11.30  Withdrawal Liability Abatement – Construction Industry Employers ................... 76
Section 11.31  Withdrawal Liability Abatement – Other Employers ........................................... 76
Section 11.32  Mass Withdrawal .......................................................................................... 76

ARTICLE 12.     TAX RULES AND AFFILIATED EMPLOYERS ............................................. 76

Section 12.01  Non-Discrimination ....................................................................................... 76
Section 12.02  Affiliated Employer Participation ..................................................................... 77
Section 12.03  Conditional Adoption ..................................................................................... 77
Section 12.04  General Affiliated Employer Rules ................................................................... 77
Section 12.05  Limitation Employer ...................................................................................... 78
Section 12.06  Top-Heavy Requirements ............................................................................... 78
Section 12.07  Maximum Benefit Limit .................................................................................. 80
Section 12.08  Defined Benefit Plan Limit ............................................................................. 80
Section 12.09  Section 415 Aggregation ............................................................................... 82
Section 12.10  Maximum Benefits Coordination ..................................................................... 82
Section 12.11  Restricted (High-25) Employees ..................................................................... 82

ARTICLE 13.     DEFINITIONS ............................................................................................ 83

## IUPAT INDUSTRY PENSION PLAN                                    PAGE 63

(b) The Trustees may delegate or assign responsibility for investment (including acquisition and disposition of assets) to an Investment Manager on the written acknowledgment of the Investment Manager of its status as a fiduciary with respect to a Plan

### Section 10.04  Source of Benefit Payments

Plan assets will be the sole source for the payment of benefits under the Plan. This Plan has been established on the basis of an actuarial calculation that has established, to the extent possible, that the contributions will, if continued, be sufficient to maintain the Plan on a permanent basis, and fulfill the funding requirements of ERISA.

### Section 10.05  Expenses.

All expenses of establishing, administering and terminating the Plan and Trust with respect to the Plan will be paid from Plan assets.

### Section 10.06  Non-Reversion.

It is expressly understood that in no event shall any of the assets of the Plan revert to the employers or be subject to any claims of any kind or nature by the Employers.

### Section 10.07  Employer Contributions.

An Employer will pay contributions to the Plan or Trust, for allocation to the Plan as directed by the Trustees, as required by law, a Collective Bargaining Agreement, a Participation Agreement or the Trust Agreement and pay interest, liquidated damages and costs of collection (including audit and attorney fees) as required by the Collective Bargaining Agreement, Participation Agreement, Trust Agreement or law.

### Section 10.08  Irrevocability of Contributions

Contributions to the Trust or Plan are irrevocable. The Employers will have no right, title or interest in contributions once paid to the Plan or Trust and no Plan assets will revert to the Employers. The Trustees may return amounts paid by an Employer due to a mistake of fact, payments conditioned on qualification of the Plan or deductibility of a payment and correct any excess contributions (as defined in IRC 4972) as provided by law.

### Section 10.09  Qualified Military Service Contributions

(a) In accordance with applicable federal law, the Trustees may charge an Employer for contributions (without interest) with respect to Qualified Military Service after October 12, 1994 upon a timely return to work with the Employers under the Plan.

(b) Absent other resolution of the Trustees, the charge will equal

(1)    the current contribution rate(s) for similarly-situated active Eligible Employees during the period of Qualified Military Service, multiplied by

(2)    average contributory hours for the Employee during a period, equal to the lesser of a period equal to the term of Qualified Military Service or twelve (12) months before the Qualified Military Service began.

(c)  Absent other resolution of the Trustees, the charge shall be allocated to Employers as follows.

(1)    Contributions for Qualified Military Service of less than thirty (30) days will be charged to the last Employer before Qualified Military Service began.

(2)    Contributions for longer Qualified Military Service will be charged in proportion to an Employee's Hours of Service in Covered Employment with each Employer in the twelve (12) month period before Qualified Military Service began. Contributions chargeable to an Employer which are not collectible will be reallocated as if the Employee had no Hours of Service in Covered Employment with the uncollectible Employer.

*Section 10.10  Return of Mistaken Contributions*

(a) The Trustees may return amounts erroneously paid to the Trust as allowed by law.

(b) A contribution or withdrawal liability payment made by reason of a mistake of fact or law, other than a mistake relating to the qualification of a Plan under IRC 401 or the exemption of the Trust from tax under IRC 501(a), may be returned within six (6) months after a determination of a mistake by the Trustees

(c) A contribution which is conditioned on initial qualification of a Plan may be returned within one (1) year after an adverse determination, provided an application for determination is filed by the time prescribed for filing the Employer's return for the taxable year in which the Plan was adopted.

(d) A contribution, which is conditioned on deductibility under IRC 404, may be returned (to the extent disallowed) within one (1) year after disallowance.

*Section 10 11  Delinquent Employers*

(a) The Trustees may terminate a person or organization as an Employer if the person or organization files to make contributions for more than 90 days after the due date. The action of the Trustees may create a Complete Withdrawal or Partial Withdrawal from the Plan by the Employer

(b) To once again become an Employer, the person or organization must post a bond in the amount of twice the delinquency and pay all current and delinquent contributions within three

months of the posting of the bond. If the Employer fails to do so, the bond shall be forfeited and the Employer will not be permitted to resume status as an Employer.

(c) If the Employer satisfies the foregoing conditions and once again is allowed to participate on that basis, the bond will be returned if reports and contributions remain current for a period of one year following reinstatement.

(d) The Trustees and the Union retain the right to enforce payment of delinquencies in accordance with other provisions of this Plan, the Trust Agreement, the applicable Collective Bargaining Agreement or Participation Agreement and applicable law.

*Section 10.12  Collection of Delinquent Contributions*

(a) In the case of a Contributing Employer that fails to make the contributions to the Plan for which it is obligated, in accordance with the terms and conditions of a collective bargaining agreement, the Trustees may bring an action on behalf of the Plan pursuant to ERISA 502(g)(2) to enforce the Contributing Employer's obligation.

(b) In any such action in which judgment is awarded in favor of the Plan, the Contributing Employer shall pay to the Plan, in accordance with the court's award:

 (1) the unpaid contributions,

 (2) interest on the unpaid contributions, determined at the rate for underpayment of federal income taxes under IRC 6621

 (3) liquidated damages equal to the greater of

  (A) the amount of interest charged on the unpaid contributions, or

  (B) 20 percent of the unpaid contributions,

 (4) reasonable attorneys' fees and costs of the action, and

 (5) such other legal or equitable relief as the court deems appropriate.

(c) Nothing in this section shall be construed as a waiver or limitation on the rights or ability of the Plan, Trustees or Union to enforce a Contributing Employer's contribution obligation in any other type of proceeding.

AMENDMENT TO THE
INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION PLAN
(as restated effective January 1, 1999)

Major Topic:                     Title to Plan Assets

General Effective Date:          January 1, 2004

The undersigned, pursuant to authorization of the Trustees of the International Painters and Allied Trades Industry Pension Fund, approve and ratify the following changes to the International Painters and Allied Trades Industry Pension Plan, as amended and restated as of January 1, 1999 and amended to date, ("Plan") and amend the Plan accordingly as set forth herein.

WHEREAS, the Trustees desire to amend the Plan to clarify that assets of the Plan or Trust include contributions that are due and payable by Employers as well as contributions that have been paid to the Plan or Trust, and

WHEREAS, the full board of Trustees has authorized the Co-Chairman to execute an amendment to reflect discussion and changes approved by the full board.

THEREFORE, the Plan shall be amended, effective on or after January 1, 2004 unless otherwise provided by the amendment or applicable law, in the following manner.

1.      Amend *Section 10.08 (Irrevocability of Contributions)* to read as follows (amended language is in bold italics):

Contributions *by Employers* to the Trust or Plan *are plan assets and* are irrevocable. The Employers will have no right, title or interest in contributions once paid to the Plan or Trust *or in contributions owed to the Trust or Plan in accordance with a collective bargaining agreement, the Trust Agreement, a Participation Agreement or applicable law but not yet paid* and no Plan assets will revert to the Employers. The Trustees may return amounts paid by an Employer due to a mistake of fact, payments conditioned on qualification of the Plan or deductibility of a payment and correct any excess contributions (as defined in IRC

172882-1

4972) as provided by law.

Witness our signatures, pursuant to authority granted by the full Board of Trustees, to memorialize our action and the prior resolutions of the Trustees to amend and restate the Plan.

EMPLOYER TRUSTEES

By: _____
Ralph A. Trallo, Co-Chair

Date: _October 14_, 2003

UNION TRUSTEES

By: _____
James A. Williams, Co-Chair

Date: _October 14_, 2003

122882-1

2

Federal Identification No.  04-3107307

Bond#6102408834                    PAYMENT BOND

49 Danton Drive

The Aulson Company, Inc.            Methuen, Massachusetts 01844
Principal                           Business Address of Principal

---

Surety                              Obligee
United States Fire Insurance Co.
50 State Street, 5th FL
Boston, MA 02109                    STATE OF MARYLAND
a corporation of the State of Delaware    By and through the Md.
and authorized to do business in   Transportation Authority
the State of Maryland

---

Penal Sum of Bond (express in words and figures)

Eighteen Million Seven Hundred Ninety Two
Thousand Twenty Two Dollars and No Cents
($18,792,022.00)                    Date of Contract

                                    *april 14*, 20 04

Description of Contract

Cleaning, Painting and Miscellaneous Structural
Repairs – Francis Scott Key Bridge    Date Bond Executed

Contract Number: KB-889-000-002        3/24            , 20  04

---

KNOW ALL MEN BY THESE PRESENTS, That we, the Principal named above and Surety na
above, are held and firmly bound unto the Obligee named above in the Penal Sum of
Performance Bond stated above, for the payment of which Penal Sum we bind ourselves, our h
executors, administrators, personal representatives, successors, and assigns, jointly and sever
firmly by these presents. However, where Surety is composed of corporations acting as co-sure
we, the co-sureties, bind ourselves, our successors and assigns, in such Penal Sum jointly
severally as well as severally only for the purpose of allowing a joint action or action against an
of us, and for all other purposes each cosurety binds itself, jointly and severally with the Princ
for the payment of such sum as appears above its name below, but if no limit of liability is indica
the limit of such liability shall be the full amount of the Penal Sum.

WHEREAS, Principal has entered into or will enter into a contract with the State, by
through the Authority named above acting for the State of Maryland, which contract is described
dated as shown above, and incorporated herein by reference. The contract and all items incorpor

15.

**[SUBSEQUENT PAGES TO BE ADDED]**

## SUBCONTRACT  LABOR AND MATERIAL  PAYMENT  BOND

BOND NUMBER  0424730

### KNOW ALL MEN BY THESE PRESENTS:

That The Aulson Company Inc. 49 Danton Drive, Methuen, MA 01844

as Principal,

International Fidelity Insurance Company

hereinafter called Principal, and  800 Hingham Street, Rockland, MA 02370  a corporation organized and existing under the laws of the State of    New Jersey   , as Surety, hereinafter called Surety, are held and firmly bound unto

Koch Skanska Inc. 400 Roosevelt Ave., Carteret, NJ 07008  as Obligee, hereinafter called Obligee,

for the use of and benefit of claimants as hereinbelow defined, in the amount of EIGHT MILLION ONE HUNDRED FIFTY

THOUSAND AND NO/100THS  Dollars ($8,150,000.00  ).
for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated  7th day of March, 2006

entered in to a subcontract with Obligee for  Cleaning, Preparing and Painting Ward's and Randall's Island Viaducts and Ward's Island Anchorage, Triborough Bridge

in accordance with drawings and specifications prepared by

which subcontract is by reference made a part hereof, and is hereafter referred to as the subcontract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if the Principal shall promptly make payment to all claimants, as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the subcontract then this obligation shall be void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

(1) A claimant is defined as one having a direct contract with the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the subcontract;

(2) The above-named Principal and Surety hereby jointly and severally agree with the Obligee that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant and have execution thereon. The Obligee shall not be liable for the payment of any costs or expenses of any such suit.

(3) No suit or action shall be commenced hereunder by any claimant,
  (a) After the expiration of one (1) year following the date on which Principal ceased work on said subcontract it being understood, however, that if any limitation embodied in this bond is prohibited by any law controlling the constitution hereof such limitatiom shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.
  (b) Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the project, or any part thereof, is situated, or in the United States District Court for the district in which the project, or any part thereof, is situated, and not elsewhere.

(4) The amount of this bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder.

Signed and sealed this    7th    day of    March    A.D., 2006

The Aulson Company Inc.

By _David T. Canton_
Executive Vice President    Principal

International Fidelity Insurance Company

By _Christine B. Gallagher_
Christine B. Gallagher, Attorney-in-Fact

## SUBCONTRACT PERFORMANCE BOND

BOND NUMBER 0424730

**KNOW ALL MEN BY THESE PRESENTS:**

That The Aulson Company Inc. 49 Danton Drive, Methuen, MA 01844

International Fidelity Insurance Company

as Principal, hereinafter called Principal, and 800 Hingham Street, Rockland, MA 02370 , a corporation organized and existing under the laws of the State of New Jersey , as Surety, hereinafter called Surety, are held and firmly bound unto

Koch Skanska Inc. 400 Roosevelt Ave., Carteret, NJ 07008 as Obligee, hereinafter called Obligee,

in the amount of **EIGHT MILLION ONE HUNDRED FIFTY THOUSAND AND NO/100THS.**

Dollars $8,150,000.00 ).

for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated 7th day of March, 2006

entered in to a subcontract with Obligee for **Cleaning, Preparing and Painting Ward's and Randall's Island Viaducts and Ward's Island Anchorage, Triborough Bridge**

in accordance with drawings and specifications prepared by ...

, which subcontract is by reference made a part hereof, and is hereafter referred to as the subcontract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:

(1) Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or;

(2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;

(3) The balance of the subcontract price, is defined below, shall be credited against the reasonable cost of completing performance of the subcontract. If completed by the Obligee, and the reasonable cost exceeds the balance of the subcontract price, the Surety shall pay to the Obligee such excess, but in no event shall the aggregate liability of the Surety exceed the amount of this bond. If the Surety arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete the subcontract or remedy the default and to reimburse the Surety for its outlays shall be paid to the Surety at the times and in the manner as said sums would have been payable to Principal had there been no default under the subcontract. The term "balance of the subcontract price," as used in this paragraph, shall mean the total amount payable by Obligee to Principal under the subcontract and any amendment thereto, less the amounts heretofore properly paid by Obligee under the subcontract.

Any suit under this bond must be instituted before the expiration of two years from date on which final payment under the subcontract falls due.

No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, administrators or successors of the Obligee.

Signed and sealed this.............7th .... day of March . . . A.D., 2006

The Aulson Company Inc.

By _Dead T. Carton_
Executive Vice President                          Principa

International Fidelity Insurance Company

By _Christine B. Gallagher_
Christine B. Gallagher, Attorney-In-Fact

Tel (973) 624-7200

# POWER OF ATTORNEY
# INTERNATIONAL FIDELITY INSURANCE COMPANY
### HOME OFFICE: ONE NEWARK CENTER, 20TH FLOOR
### NEWARK, NEW JERSEY 07102-5207

KNOW ALL MEN BY THESE PRESENTS: That INTERNATIONAL FIDELITY INSURANCE COMPANY, a corporation organized and existing under the laws of the State of New Jersey, and having its principal office in the City of Newark, New Jersey, does hereby constitute and appoint

BERYL A. FINN, CHRISTINE B. GALLAGHER, ADAM W. DESANCTIS, BRYAN F. JUWA,
DAVID A. BOUTIETTE, L. ROBERT DESANCTIS, GREGORY D. IUWA, JAMES J. AXON,
MICHAEL F. CARNEY, WILDER PARKS, JR., MICHAEL T. GILBERT

Woburn, MA.

its true and lawful attorney(s)-in-fact to execute, seal and deliver for and on its behalf as surety, any and all bonds and undertakings, contracts of indemnity and other writings obligatory in the nature thereof, which are or may be allowed, required or permitted by law, statute, rule, regulation, contract or otherwise, and the execution of such instrument(s) in pursuance of these presents, shall be as binding upon the said INTERNATIONAL FIDELITY INSURANCE COMPANY, as fully and amply, to all intents and purposes, as if the same had been duly executed and acknowledged by its regularly elected officers at its principal office.

This Power of Attorney is executed, and may be revoked, pursuant to and by authority of Article 3-Section 3, of the By-Laws adopted by the Board of Directors of INTERNATIONAL FIDELITY INSURANCE COMPANY at a meeting called and held on the 7th day of February, 1974.

The President or any Vice President, Executive Vice President, Secretary or Assistant Secretary, shall have power and authority

(1) To appoint Attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the Seal of the Company thereto, bonds and undertakings, contracts of indemnity and other writings obligatory in the nature thereof and.

(2) To remove, at any time, any such attorney-in-fact and revoke the authority given.

Further, this Power of Attorney is signed and sealed by facsimile pursuant to resolution of the Board of Directors of said Company adopted at a meeting duly called and held on the 29th day of April, 1982 of which the following is a true excerpt:

Now therefore the signatures of such officers and the seal of the Company may be affixed to any such power of attorney or any certificate relating thereto by facsimile, and any such power of attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by facsimile signatures and facsimile seal shall be valid and binding upon the Company in the future with respect to any bond or undertaking to which it is attached.



IN TESTIMONY WHEREOF, INTERNATIONAL FIDELITY INSURANCE COMPANY has caused this instrument to be signed and its corporate seal to be affixed by its authorized officer, this 29th day of August, A.D. 2003.

INTERNATIONAL FIDELITY INSURANCE COMPANY

STATE OF NEW JERSEY
County of Essex

Secretary

On this 29th day of August 2003, before me came the individual who executed the preceding instrument, to me personally known, and, being by me duly sworn, said he is the therein described and authorized officer of the INTERNATIONAL FIDELITY INSURANCE COMPANY; that the seal affixed to said instrument is the Corporate Seal of said Company; that the said Corporate Seal and his signature were duly affixed by order of the Board of Directors of said Company.



IN TESTIMONY WHEREOF, I have hereunto set my hand affixed my Official Seal,
at the City of Newark, New Jersey the day and year first above written.

A NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Nov. 21, 2005

### CERTIFICATION

I, the undersigned officer of INTERNATIONAL FIDELITY INSURANCE COMPANY do hereby certify that I have compared the foregoing copy of the Power of Attorney and affidavit, and the copy of the Section of the By-Laws of said Company as set forth in said Power of Attorney, with the originals on file in the home office of said company, and that the same are correct transcripts thereof, and of the whole of the said originals, and that the said Power of Attorney has not been revoked and is now in full force and effect.

IN TESTIMONY WHEREOF, I have hereunto set my hand this    7th    day of    March    2006

Assistant Secretary

**[TO BE ADDED]**

BOND NO. 680-6639 as to SAFECO; 1045 274 94 (as to Travelers)

## CONTRACT PAYMENT BOND

(Surety Company Form)

KNOW ALL MEN BY THESE PRESENTS: That **Cianbro Corporation, of Pittsfield and the State of Maine**, as principal, and **Safeco Insurance Company of America and Travelers Casualty and Surety Company of America, Corporations** duly organized under the laws of the States of **Washington and Connecticut** respectively, and having a usual place of business in Auburn, Maine, as Sureties, are held and firmly bound unto the **Treasurer of the State of Maine** for the use and benefit of claimants as herein below defined in the sum of **ELEVEN MILLION TWO HUNDRED SIXTY-FOUR THOUSAND THREE HUNDRED AND 50/100THS Dollars ($11,264,300.50)**, to be paid said **Treasurer of the State of Maine** or his successors in office, for which payment well and truly to be made, Principal and Sureties bind themselves, their heirs, executors and administrators, successors and assigns, jointly and severally by these presents.

Whereas, Principal has by written agreement dated **June 1st, 2005** entered into a contract with the State of Maine for **CARLTON BRIDGE REHABILITATION IN THE TOWNS OF BATH AND WOOLWICH, MAINE, MFAP# NH-HP-2393 (40), PIN # 2393.40.**

The condition of this obligation is such that if the Principal designated as Contractor in the foregoing contract, shall promptly satisfy all claims and demands incurred for all labor and material, used or required by him in connection with the work contemplated by said contract, and shall fully reimburse the obligee for all outlay and expense which the obligee may incur in making good any default of said Principal, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

A claimant is defined as one having a direct contract with the Principal or with a Subcontractor of the Principal for labor, material or both, used or reasonably required for use in the performance of the contract.

Signed and sealed this **16th day of June, 2005.**

WITNESSES:                                          SIGNATURES:

CONTRACTOR: Cianbro Corporation

Signature *Shelly Campbell*

Print Name Legibly *Shelly Campbell*

Print Name Legibly *Thomas E. Stone*

Signature *Nancy Peters*

Print Name Legibly: **Nancy E. Peters**

SURETY:   **Safeco Insurance Company of America**

Joline L. Binette, Attorney-In-Fact
Print Name Legibly

SURETY:   **Travelers Casualty and Surety Company of America**

Signature *Nancy Peters*

Print Name Legibly:  **Nancy E. Peters**

Joline L. Binette, Attorney-In-Fact
Print Name Legibly

SURETY ADDRESS:
P. O. Box 40
Auburn, ME  042120-0040
TELEPHONE (207) 783-2211

NAME OF LOCAL AGENCY:
ADDRESS: HRH Northern New England
P.O. Box 40, Auburn, ME  04212-0040
(207) 783-2211

# EXHIBIT B

## IMPORTANT NOTICE TO SURETY BOND CUSTOMERS REGARDING THE TERRORISM RISK INSURANCE ACT OF 2002

As a surety bond customer of one of the SAFECO insurance companies (SAFECO Insurance Company of America, General Insurance Company of America, First National Insurance Company, American States Insurance Company or American Economy Insurance Company), it is our duty to notify you that the Terrorism Risk Insurance Act of 2002 extends to "surety insurance". This means that under certain circumstances we may be eligible for reimbursement of certain surety bond losses by the United States government under a formula established by this Act.

Under this formula, the United States government pays 90% of losses caused by certified acts of terrorism that exceed a statutorily established deductible to be paid by the insurance company providing the bond. The Act also establishes a $100 billion cap for the total of all losses to be paid by all insurers for certified acts of terrorism. Losses on some or all of your bonds may be subject to this cap.

This notice does not modify any of the existing terms and conditions of this bond, the underlying agreement guaranteed by this bond, any statutes governing the terms of this bond or any generally applicable rules of law.

At this time there is no premium change resulting from this Act.

**SAFECO**

POWER
OF ATTORNEY

SAFECO INSURANCE COMPANY OF AMERICA
GENERAL INSURANCE COMPANY OF AMERICA
HOME OFFICE: SAFECO PLAZA
SEATTLE, WASHINGTON 98185

No. 9244

KNOW ALL BY THESE PRESENTS:

That SAFECO INSURANCE COMPANY OF AMERICA and GENERAL INSURANCE COMPANY OF AMERICA, each a Washington corporation, does each hereby appoint

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*DEBORAH DUNLAP AVASTHI; DERON R. TREADWELL; MICHELLE V. ORLANDO; NANCY E. PETERS; JOLINE L BINETTE; SHANNON S. WALTON; MICHAEL A. VINER; Auburn, Maine\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

its true and lawful attorney(s)-in-fact, with full authority to execute on its behalf fidelity and surety bonds or undertakings and other documents of a similar character issued in the course of its business, and to bind the respective company thereby.

IN WITNESS WHEREOF, SAFECO INSURANCE COMPANY OF AMERICA and GENERAL INSURANCE COMPANY OF AMERICA have each executed and attested these presents

this __16th__                                                    day of __December__ , __2004__

CHRISTINE MEAD, SECRETARY                                         MIKE MCGAVICK, PRESIDENT

---

CERTIFICATE

Extract from the By-Laws of SAFECO INSURANCE COMPANY OF AMERICA
and of GENERAL INSURANCE COMPANY OF AMERICA:

"Article V, Section 13. - FIDELITY AND SURETY BONDS ... the President, any Vice President, the Secretary, and any Assistant Vice President appointed for that purpose by the officer in charge of surety operations, shall each have authority to appoint individuals as attorneys-in-fact or under other appropriate titles with authority to execute on behalf of the company fidelity and surety bonds and other documents of similar character issued by the company in the course of its business... On any instrument making or evidencing such appointment, the signatures may be affixed by facsimile. On any instrument conferring such authority or on any bond or undertaking of the company, the seal, or a facsimile thereof, may be impressed or affixed or in any other manner reproduced; provided, however, that the seal shall not be necessary to the validity of any such instrument or undertaking."

Extract from a Resolution of the Board of Directors of SAFECO INSURANCE COMPANY OF AMERICA
and of GENERAL INSURANCE COMPANY OF AMERICA adopted July 28, 1970.

"On any certificate executed by the Secretary or an assistant secretary of the Company setting out,
    (i)   The provisions of Article V, Section 13 of the By-Laws, and
    (ii)  A copy of the power-of-attorney appointment, executed pursuant thereto, and
    (iii) Certifying that said power-of-attorney appointment is in full force and effect,
the signature of the certifying officer may be by facsimile, and the seal of the Company may be a facsimile thereof."

I, Christine Mead, Secretary of SAFECO INSURANCE COMPANY OF AMERICA and of GENERAL INSURANCE COMPANY OF AMERICA, do hereby certify that the foregoing extracts of the By-Laws and of a Resolution of the Board of Directors of these corporations, and of a Power of Attorney issued pursuant thereto, are true and correct, and that both the By-Laws, the Resolution and the Power of Attorney are still in full force and effect.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the facsimile seal of said corporation

this __16th__                    day of __June A. D.__ , __2005__

**For att. to Bonds No. 630 6639**

 

CHRISTINE MEAD, SECRETARY

® A registered trademark of SAFECO Corporation
12/16/2004 PDF

**TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA**
**TRAVELERS CASUALTY AND SURETY COMPANY**
**FARMINGTON CASUALTY COMPANY**
Hartford, Connecticut 06183-9062

## POWER OF ATTORNEY AND CERTIFICATE OF AUTHORITY OF ATTORNEY(S)-IN-FACT

KNOW ALL PERSONS BY THESE PRESENTS, THAT TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, corporations duly organized under the laws of the State of Connecticut, and having their principal offices in the City of Hartford, County of Hartford, State of Connecticut, (hereinafter the "Companies") hath made, constituted and appointed, and do by these presents make, constitute and appoint: Michelle V. Orlando, Nancy E. Peters, Joline L. Binette, Shannon S. Walton, Michael A. Viner, Deborah Dunlap Avasthi, Deron K. Treadwell, of Auburn, Maine, their true and lawful Attorney(s)-in-Fact, with full power and authority hereby conferred to sign, execute and acknowledge, at any place within the United States, the following instrument(s): by his/her sole signature and act, any and all bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking and any and all consents incident thereto and to bind the Companies, thereby as fully and to the same extent as if the same were signed by the duly authorized officers of the Companies, and all the acts of said Attorney(s)-in-Fact, pursuant to the authority herein given, are hereby ratified and confirmed.

This appointment is made under and by authority of the following Standing Resolutions of said Companies, which Resolutions are now in full force and effect:

VOTED: That the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President, any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary may appoint Attorneys-in-Fact and Agents to act for and on behalf of the company and may give such appointee such authority as his or her certificate of authority may prescribe to sign with the Company's name and seal with the Company's seal bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said officers or the Board of Directors at any time may remove any such appointee and revoke the power given him or her.

VOTED: That the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President may delegate all or any part of the foregoing authority to one or more officers or employees of this Company, provided that each such delegation is in writing and a copy thereof is filed in the office of the Secretary.

VOTED: That any bond, recognizance, contract of indemnity, or writing obligatory in the nature of a bond, recognizance, or conditional undertaking shall be valid and binding upon the Company when (a) signed by the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary and duly attested and sealed with the Company's seal by a Secretary or Assistant Secretary, or (b) duly executed (under seal, if required) by one or more Attorneys-in-Fact and Agents pursuant to the power prescribed in his or her certificate or their certificates of authority or by one or more Company officers pursuant to a written delegation of authority.

This Power of Attorney and Certificate of Authority is signed and sealed by facsimile (mechanical or printed) under and by authority of the following Standing Resolution voted by the Boards of Directors of TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, which Resolution is now in full force and effect:

VOTED: That the signature of each of the following officers: President, any Executive Vice President, any Senior Vice President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary, and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Resident Vice Presidents, Resident Assistant Secretaries or Attorneys-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company in the future with respect to any bond or undertaking to which it is attached.

Case 1:07-cv-00684-PLF   Document 31-8   Filed 09/05/2008   Page 5 of 5

IN WITNESS WHEREOF, TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY have caused this instrument to be signed by their Senior Vice President and their corporate seals to be hereto affixed this 14th day of December, 2004.

STATE OF CONNECTICUT

        )SS. Hartford

COUNTY OF HARTFORD

 

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA
TRAVELERS CASUALTY AND SURETY COMPANY
FARMINGTON CASUALTY COMPANY

By

George W. Thompson
Senior Vice President

On this 14th day of December, 2004 before me personally came GEORGE W. THOMPSON to me known, who, being by me duly sworn, did depose and say: that he/she is Senior Vice President of TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, the corporations described in and which executed the above instrument; that he/she knows the seals of said corporations; that the seals affixed to the said instrument are such corporate seals; and that he/she executed the said instrument on behalf of the corporations by authority of his/her office under the Standing Resolutions thereof.

My commission expires June 30, 2006  Notary Public
Marie C. Tetreault

CERTIFICATE

I, the undersigned, Senior Vice President of TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, stock corporations of the State of Connecticut, DO HEREBY CERTIFY that the foregoing and attached Power of Attorney and Certificate of Authority remains in full force and has not been revoked; and furthermore, that the Standing Resolutions of the Boards of Directors, as set forth in the Certificate of Authority, are now in force.

Signed and Sealed at the Home Office of the Company, in the City of Hartford, State of Connecticut. Dated this **16th** day of **June A. D.**, 20 **05**

**For att. to Bonds No. 1045 274 94**

  

By

Peter Schwartz
Senior Vice President